MORGAN, LEWIS & BOCKIUS LLP
GEORGE A. STOHNER (SBN 214508)
gstohner@morganlewis.com
77 West Wacker Drive
Chicago, IL  60601-5094
Tel:   312.324.1000
Fax:   312.324.1001

MORGAN, LEWIS & BOCKIUS LLP
JASON S. MILLS (SBN 225126)
jmills@morganlewis.com
ALEXANDER M. CHEMERS (SBN 263726)
achemers@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA  90071-3132
Tel:   213.612.2500
Fax:   213.612.2501

Attorneys for Defendant M-I L.L.C.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARMAD SYED, individually, and on behalf of all others similarly situated; ASHLEY BALFOUR, individually, and on behalf of all others similarly situated,, <br><br> Plaintiffs, <br><br> vs. <br><br> M-I., L.L.C. a Delaware Limited Liability Company, doing business as M-I SWACO; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 1:12-cv-01718-AWI-MJS <br><br> **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION** <br><br> Date:        March 28, 2014 <br> Time:       9:30 a.m. <br> Judge:      Anthony W. Ishii <br> Courtroom:  2 |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1

**TABLE OF CONTENTS**

2
**Page**

3

I.   INTRODUCTION ..................................................................................1

4   II.   BACKGROUND ...................................................................................2

5        A.   M-I SWACO ...............................................................................2

6        B.   The Complex Duties of the Mud Engineers .........................................5

7        C.   Mud Engineers' Experience and Ability Vary from  Individual to Individual.................................................................................7

8        D.   The Company Man's Experience and Oversight Changes from Site-to-Site................................................................................8

9        E.   Balfour's Description of His Job Duties Contradicts Other Mud Engineers .................................................................................9

10   III.  PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED ...........................................................................13

11        A.   Rigorous Review Is Needed Before Conditional Certification Is Granted .................................................................................13

12             1.   Even The Lower Standard for Conditional Certification Requires Meaningful Record Evidence that Plaintiffs and the Mud Engineers They Seek to Represent Are Similarly Situated.....................................................................14

13             2.   Courts Apply a Stricter Standard for Certification Where, as Here, Considerable Discovery Has Occurred ......................15

14        B.   Plaintiffs Have Failed to Meet Their Burden to Demonstrate That They Were Victims of a Common Unlawful Policy..................16

15        C.   Determining Mud Engineers' Exempt Status Necessarily Involves Complex, Individualized Factual Inquiries .........................18

16        D.   The Evidence Shows that Plaintiffs and Their Declarants Are Not Similarly Situated to One Another .............................................21

17        E.   The Evidence Shows that Plaintiffs Are Not Similarly Situated to Other Mud Engineers, Whose Duties Vary in Ways Material to the Potential Exemptions .............................................................23

18             1.   Every Site Is Different .............................................................25

19             2.   Every Company Man Is Different.............................................26

20             3.   Every Mud Engineer's Experience And Ability Are Different ....................................................................27

21             4.   Mud Engineers Work Different Rotations................................28

22   IV.   CONCLUSION......................................................................................29

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Aguirre v. SBC Commc'ns, Inc.*
  No. H-05-3198, 2007 WL 772756 (S.D. Tex. Mar. 12, 2007)..........................20

*Armstrong v. Weichert Realtors*
  No. 05-3120 (JAG), 2006 WL 1455781 (D.N.J. 2006) ...................................20

*Camper v. Home Quality Mgmt., Inc.*
  200 F.R.D. 516 (D. Md. 2000) ........................................................................13

*Clausman v. Nortel Networks, Inc.*
  No. IP 02-0400-C-M/S, 2003 WL 21314065 (N.D. Ind. May 1, 2003) ............21

*Colson v. Avnet*
  687 F. Supp. 2d 914 (D. Ariz. 2010) ................................................... 14, 17, 22

*Davis v. Charoen Pokphand (USA), Inc.*
  303 F. Supp. 2d 1272 (M.D. Ala. 2004) ..........................................................16

*Dean v. Priceline.com, Inc.*
  No. 3:00CH273 (DJS), 2001 WL 35961086 (D. Conn. June 6, 2001).............21

*Dewan v. M-I SWACO* (S.D. Tex. Case No. 12-cv-03638)..........................9, 10, 27

*Diaz v. Electronics Boutique of America, Inc.*
  No. 04-CV-0840E(SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ...........21

*Edwards v. City of Long Beach*
  467 F. Supp. 2d 986 (C.D. Cal. 2006) .............................................................29

*England v. New Century Fin. Corp.*
  370 F. Supp. 2d 504 (M.D. La. 2005) ....................................................... 15, 21

*Felix v. Davis Moreno Constr., Inc.*
  No. CV F 07-0533 LJO GSA, 2008 WL 4104261 (E.D. Cal. Sept. 03,
  2008) ...............................................................................................................16

*Fetrow-Fix v. Harrah's Entertainment, Inc.*
  No. 2:10-cv-00560-RLH-PAL, 2011 WL 6938594 (D. Nev. Dec. 30,
  2011) ...............................................................................................................15

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

ii

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

*Freeman v. Nat'l Broad. Co.*
   80 F.3d 78 (2d Cir. 1996).....................................................................................19

*Freeman v. Wal-Mart Stores, Inc.*
   256 F. Supp. 2d 941 (W.D. Ark. 2003) .....................................................18, 21

*Haines v. Southern Retailers, Inc.*
   939 F. Supp. 441 (E.D. Va. 1996)...................................................................19

*Harris v. Fee Transp. Servs., Inc*.
   No. A.3:05CV0077-P, 2006 WL 1994586 (N.D. Tex. May 15, 2006) .............15

*Hinojos v. Home Depot, Inc.*
   No. 2:06-CV-00108, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) .....................14

*Hoffman-La Roche v. Sperling*
   493 U.S. 165 (1989).........................................................................................13

*Holt v. Rite Aid Corp.*
   333 F. Supp. 2d 1265 (M.D. Ala. 2004)...................................................18, 21

*In re Wells Fargo Home Mortgage Overtime Pay Litig*.
   571 F.3d 953 (9th Cir. 2009).......................................................................17, 19

*Kennedy v. Commonwealth Edison Co.*
   410 F.3d 365 (7th Cir. 2005)...........................................................................20

*King v. West Corp*.
   No. 8:04CV318, 2006 WL 118577 (D. Neb. Jan. 13, 2006)............................17

*Koppinger v. American Interiors, Inc.*
   295 F. Supp. 2d 797 (N.D. Ohio 2003) ...........................................................20

*Mike v. Safeco, Ins. Co. of America*
   274 F. Supp. 2d 216 (D. Conn. 2003) ........................................................19, 21

*Morisky v. Public Serv. Electric and Gas Co.*
   111 F. Supp. 2d 493 (D.N.J. 2000)..................................................................18

*Pfohl v. Farmers Ins. Group*
   No. CV03-3080 DT (RCX), 2004 WL 554834 (C.D. Cal. Mar. 1, 2004)...15, 20

*Reich v. Homier Distrib. Co.*
   362 F. Supp. 2d 1009 (N.D. Ind. 2005)............................................................21

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

iii

*Smith v. T-Mobile USA, Inc.*
    No. CV 05-5274 ABC, 2007 WL 2385131 (C.D. Cal. Aug. 15, 2007).............13

*Trinh v. JP Morgan Chase & Co*.
No. 07-CV-1666 W (WMC), 2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) ..*passim*

*Tyler v. Payless Shoe Source, Inc.*
    No. 2:05-CV-33F(WO), 2005 WL 3133763 (M.D. Ala. Nov. 23, 2005)..........21

*Ugas v. H&R Block Enterprises, LLC*
    Case No. CV 09-6510-CAS, 2011 WL 3439219 (C.D. Cal. Aug. 4, 2011) ......15

*Vinole v. Countrywide Home Loans, Inc*.
    571 F.3d 935 (9th Cir. 2009)....................................................................17, 19

*Williams v. Lockheed Martin Corp.*
    No. 09cv1669 WQH (POR), 2011 WL 2200631 (S.D. Cal. June 2, 2011) .......19

*Wombles v. Title Max of Alabama, Inc.*
    No. 303CV1158CWO, 2005 WL 3312670 (M.D. Ala. Dec. 7 2005) ..............21

**FEDERAL STATUTES**

29 U.S.C. § 207 ................................................................................................17

29 C.F.R. § 541.200(a).......................................................................................18

29 C.F.R. § 541.200(a)(2)-(3) ............................................................................20

29 C.F.R. § 541.201(a).......................................................................................18

29 C.F.R. § 541.202(b) ................................................................................19, 20

29 C.F.R. § 541.202(c).......................................................................................19

29 C.F.R. § 541.207(a).......................................................................................20

29 C.F.R. § 541.301(a).......................................................................................19

29 C.F.R. § 541.700(a).......................................................................................19

29 C.F.R. § 541.700(b).......................................................................................19

69 Fed. Reg. 22122, 22142 (Apr. 23, 2004) ........................................................20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

iv

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   **I.**      **<u>INTRODUCTION</u>**

2        Plaintiffs contend that <u>all</u> of M-I SWACO's Drilling Fluid Specialists

3   ("DFS" or "mud engineer") throughout the country are improperly classified as

4   exempt based on the faulty premise that all mud engineers do their job by following

5   "step-by-step" instructions.  Plaintiffs cannot certify a conditional class based on

6   this theory.

7        As an initial matter, Plaintiffs place great weight on the supposed "lenient"

8   standard they face in certifying a conditional class at this juncture.  However, even

9   at the "first-step" of a motion for conditional certification, a plaintiff is required to

10   submit evidence showing that the proposed members of the collective action are

11   "similarly situated."  Further, the "first-step" standard only applies where

12   substantial discovery has not already occurred.  In this case, which has been

13   pending for well over a year, the parties have conducted substantial written

14   discovery, conducted a Rule 30(b)(6) deposition, and deposed both Plaintiffs and

15   their two declarants.  The record in this matter, thus, is sufficiently developed such

16   that the court can analyze the highly individualized nature of Plaintiffs' claims and

17   make an informed ruling that certification is improper.

18        Regardless of the standard, Plaintiffs' motion for conditional certification

19   should be denied because their theory of liability is not capable of common proof.

20   Plaintiffs bear the burden of showing with admissible evidence that they and other

21   mud engineers were "similarly situated" victims of an *unlawful* and *common* policy.

22   And it is not enough simply to contend that *all mud engineers are classified as*

23   *exempt*.  The FLSA does not prohibit employers from classifying employees as

24   exempt who meet the exemption's criteria.

25        Further, Plaintiffs cannot establish through common proof that all mud

26   engineers are, in fact, improperly classified as exempt.  Mud engineers monitor and

27   analyze the well's drilling fluids and prepare and recommend "treatment plans" to

28   the company man in an ever-changing and dynamic environment.  They work

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Los Angeles

DB2/ 24700688

1

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1  different rotations, at any of thousands of different sites throughout the country, for

2  hundreds of different company men, operating under unique mud programs, while

3  dealing with countless different geological formations and responding to any

4  number of daily "unscheduled" events.  To the extent a particular mud engineer, on

5  any particular day, executed his or her responsibilities by – as Plaintiffs would have

6  it – following "step-by-step instructions" in such a way that invalidated the

7  applicable exemption, the inquiry to reach any such finding is highly

8  individualized.  As Plaintiffs' deposition testimony confirms, Plaintiffs are not even

9  "similarly situated" to each other, let alone hundreds or thousands of non-parties.

10      For the foregoing reasons, Plaintiffs' Motion for Conditional Certification

11  should be denied.

12  **II.  <u>BACKGROUND</u>**

13      **A.  <u>M-I SWACO</u>**

14      M-I SWACO is an industry leader in engineering drilling fluid systems and

15  additives for oil and gas well drilling operations.  (Declaration of Reginald

16  Stanfield, ¶ 2.)  It customizes drilling fluid systems and associated additives that

17  improve efficiencies, reduce costs and minimize Health, Safety and Environmental

18  ("HSE") impact in the most demanding applications.  (Id.)

19      As part of its business, M-I SWACO employs Drilling Fluid Specialists or

20  "mud engineers."  (Id. at ¶ 3.)  Mud engineers are technical experts in the area of

21  drilling fluid and are employed at customer's sites – the drilling rig – to provide

22  advice and support directly to the customer.  (Id.)  Unless they have previous

23  industry experience, a new hire needs to complete an eight-week instruction course

24  (called "mud school"), "the hardest academic undertaking I've ever gone through in

25  my life," in the words of one of Plaintiffs' declarants.  (Stanfield Decl., ¶ 9; Crane

26  Depo. 59:8-10.)

27      Mud engineers are the face of M-I SWACO and manage the drilling fluid

28  system, referred to as the "mud system" in the industry, at the client's drill site.  (Id.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

2

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   at ¶ 3; Balfour Depo. 187:11-13 ("Q: So you are really the face of the company

2   when it comes to M-I Swaco?  A: Yes").[1]

3          A mud engineer's responsibilities include sales.  As part of their overall

4   management of the drilling fluid, mud engineers identify potential drilling fluid

5   solutions (i.e., treatment plans) and then recommend M-I SWACO products that

6   can be used to effectuate the plan.  (Stanfield Decl., ¶ 8; Balfour Depo. 218:22-

7   219:17; Dewan Depo. 79:19-80:4.)  The mud engineer attempts to influence the

8   company man to use the M-I SWACO products as opposed to products made by

9   other companies.  (Stanfield Decl., ¶ 8.)  The mud engineer orders the products

10  from the M-I SWACO warehouse, receives them at the drilling site, and then

11  oversees the incorporation of the chemicals into the drilling mud system.  (Stanfield

12  Decl., ¶ 8; Dewan Depo. 79:7-11.)

13         A key benefit of the mud engineer position is the rotation.  Mud engineers

14  who stay at the location generally work a schedule where they are on site for 14

15  days and then off duty for the next 14 days.  (Balfour Depo. 38:15-39:11 ("Q: And

16  what about the job interested you?  A: The two-week rotation, being off for two

17  weeks at a time definitely caught my eye").  Mud engineers, including Balfour, are

18  not required to report to work during the off-duty period.  (Stanfield Decl., ¶ 11;

19  Balfour Depo. 59:7-15 ("Q: And you were never expected or required to report to

20  M-I Swaco headquarters in Bakersfield or anything.  Right?  A: No.  I wasn't

21  required to report to them on my days off").)  Mud engineers are exempt employees

22  and, thus, are paid on a salary basis, so they get paid whether they are "on" rotation

23  or "off" rotation – meaning they are paid for two weeks of doing nothing.  (Balfour

24  Depo. 57:21-58:25.)

25         Mud engineers service the wells based on customer needs.  Mud engineers

26  may be assigned to a single well, either as the sole mud engineer on site or as one of

27

28

---

[1] Throughout the relevant time period, mud engineers have been paid on a salary basis and have earned more than $455 per week.  (Stanfield Decl., ¶ 14.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

3

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   two mud engineers who alternate 12-hour shifts.  (Stanfield Decl., ¶ 10.)[2]

2   Alternatively, they may conduct "drive-bys."  With "drive-bys," mud engineers

3   visit several wells per day and run a battery of tests on the mud to determine if any

4   adjustments to the drilling fluid are necessary.  (Id. at ¶ 10.)  A mud engineer's

5   living situation varies from well to well, with some mud engineers living in fully-

6   equipped trailers (including satellite televisions, kitchens, etc.), in hotels, or even

7   going home during their off hours.  (Id. at ¶ 12; see also, e.g., Declaration of Jamie

8   Marquez, ¶ 10.)

9          Plaintiff Balfour was employed as a mud engineer by M-I SWACO between

10  August 2011 and November 2012.  (Balfour  Depo. 202:6-9, 324:9-12.)  Balfour

11  worked primarily at two different "leases" (the land where customer drilling sites

12  are located) – Kern River and Lost Hills.  (See, e.g., id. at 230:15-24; 300:17-23.)

13  Balfour preferred to be assigned as the sole mud engineer on-site (commonly

14  referred to as a "24-hour shift") and left the company after being assigned to a site

15  with another mud engineer.  (Id. at 68:4-5 (testifying that he preferred to work a

16  "24-hour" rotation because he "didn't have to turn over to somebody[,]" he "got to

17  do all the paperwork[,]" he "didn't have to go back and fix anything[,]" and another

18  mud engineer would not come in and "change the mud").)

19         The other Plaintiff, Sarmad Syed, never even made it to mud school – let

20  alone ever worked as a mud engineer.  (Balfour Depo. 45:16-20 ("[Syed] never

21  went to mud school, so I wouldn't give him the title of mud man").)  Syed accepted

22  a position with M-I SWACO in August 2011.  (Syed Depo. 86:18-20.)  He attended

23  the orientation, participated in "drive bys" for a few weeks, then went home and

24  never came back.  (Syed Depo. 87:3-14; 95:14-17; 158:21-159:2; 160:18-19.)

---

25
26  [2] Whether there are one or two mud engineers assigned to a well depends upon
    several factors, including the severity of drilling and the customer's requirements.
27  (Stanfield Decl., ¶ 10.)  It also depends upon the geographic area – for instance,
    having two mud engineers assigned to a well is more common in California than in
28  some other areas.  (Id.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

4

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1  Despite having never worked as a mud engineer, Syed initiated this lawsuit and

2  later (though he untruthfully denied it under oath) recruited Balfour to join him in

3  suing M-I SWACO.  (Syed Depo. 57:16-17 ("Q: Have you and Ashley [Balfour]

4  discussed this lawsuit?  A. No, sir); 60:15-16 ("Q: Did you ever tell Ashley

5  [Balfour] about this lawsuit?  A. No."); Balfour Depo. 156:12-16 ("Q: Is Sam

6  [Syed] the one who told you about this lawsuit?  A: That is correct, yes.  Q: Did he

7  ask you if you were interested in participating?  A: Yes.").)

8       **B.**    <u>**The Complex Duties of the Mud Engineers**</u>

9        Mud engineers work in a dynamic, ever-changing environment that requires

10  their constant adjustment to the circumstances of the particular well site.  (Stanfield

11  Decl., ¶ 4.)  As one of the two Plaintiffs in this case (and the only one who actually

12  worked as a mud engineer), Ashley Balfour, explained, "[E]very well is different….

13  Every formation is different you are drilling through.  I mean, every foot is going to

14  be different.  Nothing is the same out there."  (Balfour Depo. 72:10-23.)

15        A "project engineer" prepares a "mud program" for each site, which contains

16  specifications based on historical drilling in the area and provides parameters that

17  mud engineers use as a target.  (Stanfield Decl., ¶ 4, Fullmer Decl., ¶ 10.)  But the

18  well changes on a foot-by-foot basis and the drilling fluid must change with it.  (<u>Id.</u>)

19  For this reason, mud engineers constantly monitor the drilling fluid, perform mud

20  tests, analyze the results against the mud program's parameters, look for trends, and

21  create a specific "mud plan" or "treatment plan" designed to stabilize the drilling

22  hole, properly remove the cuttings, and protect and lubricate the drill itself.  (<u>Id.</u>)

23  / / / /

24  / / / /

25  / / / /

26  / / / /

27  / / / /

28  / / / /

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Los Angeles

DB2/ 24700688

5

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   Maintaining the drilling fluid is a complicated and ongoing procedure

2   requiring the mud engineer to make tradeoffs in choosing the right mix of products.

3   Indeed, the Drilling Fluids Engineering Manual (hereinafter "Manual") states as

4   follows:

5       Drilling fluid engineering almost always requires tradeoffs in treating
        and maintaining the properties needed to accomplish the required
6       functions.  [For example], [a] high mud viscosity might improve hole
        cleaning, yet it might lower the hydraulic efficiency, increase drill
7       solids retention, slow the penetration rate, and change dilution and
        chemical treatment requirements.  Experienced drilling fluid engineers
8       are aware of these tradeoffs and understand how to improve one
        function while minimizing the impact of mud property changes on
9       other functions.

10  (Stanfield Decl., ¶ 5, Ex. A; see also, e.g., Croy Decl., ¶ 3; Price Decl., ¶¶ 3-4.)

11      Improperly maintained mud can have severe or even catastrophic

12  consequences.  (Stanfield Decl., ¶ 6.)  For example, improperly maintained mud

13  can result in a loss of circulation, preventing the mud from removing cuttings from

14  the hole.  This loss of circulation causes a stop to drilling operations until

15  circulation is restored.  In other instances, loss of circulation could result in a stuck

16  pipe, or the hole could collapse in on the drill string also resulting in a stuck pipe.

17  A stuck pipe not only results in costly downtime but also results in costly efforts to

18  unstick the pipe, drill around the stuck pipe, or abandonment of the well.  (Id.)

19  Improperly maintained mud can also result in intrusion of gas and oil into the hole

20  which can result in "gas kicks" or explosions.  Finally, improperly maintained mud

21  can also result in excessive intrusion of drilling fluid into the geologic formation,

22  which could cause environmental damage.  (Id.)

23      Mud engineers do not perform manual work.  (Balfour Depo. 80:7-9.)  Rig

24  personnel do.  Mud engineers are on site to monitor and analyze the drilling fluid,

25  create treatment plans, and advise the company man on all aspects of the drilling

26  fluid.  (See, e.g., Stanfield Decl., ¶ 7; Fullmer Decl., ¶¶ 4-7, Croy Decl., ¶¶ 2-4.)

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

6

## C.   Mud Engineers' Experience and Ability Vary from Individual to Individual

The manner in which a mud engineer performs his or her job depends greatly on that mud engineer's experience and ability.  Until recently,[3] M-I SWACO classified its mud engineers based on experience level.  A mud engineer could be classified as a DFS "I" through "IV" or a DFS "Senior."  M-I SWACO also engaged particularly seasoned mud engineers as "consultants."  (Stanfield Decl., ¶ 13.)  Mud engineers who had just graduated from mud school were typically classified as a "DFS I."  (Id.)  As mud engineers gained experienced and completed certain competency requirements, they advanced through the classifications.  (Id.)

Mud engineers increase their skill level and credibility with experience because:

►     They have created treatment plans to address numerous geological formations and well-types;

►     They have experienced countless "unscheduled events" and created and implemented remedial plans;

►     They have encountered situations that are not taught in mud school or addressed in the "mud program";

►     They recognize that the "mud program" does not provide comprehensive instructions for creating a treatment plan, but that it exists as a starting point and reference;

►     They have developed a heightened understanding of the available products and materials;

►     They have gained confidence in advising the company man on all aspects of the drilling fluid;

---

[3] M-I SWACO recently has removed the numerical classification but continues to assign and compensate mud engineers based on experience level and ability.  (Id.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

7

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1    ►    They have gained a higher stature at the site and increased

2    deference from the company man and other rig personnel;

3    (See, e.g., Blanton Decl., ¶ 15; Croy Decl., ¶ 6; Cusick Decl., ¶ 5; Marquez Decl., ¶

4    6; Mooren Decl., ¶¶ 5-7; Pinter Decl., ¶¶ 5, 11-12; Price Decl., ¶¶ 3-4, 9;

5    Wojciechowicz Decl., ¶¶ 4-5.)

6    Before working a drilling rig, a newly hired mud engineer will generally

7    spend days or weeks as a "ride-along" observing more experienced mud engineers,

8    complete mud school, and then spend additional time as a trainee, continuing to

9    observe more experienced mud engineers.  (Stanfield Decl., ¶ 9.)  Moreover, even

10   after they are trusted to work on a rig, a more junior mud engineer will sometimes

11   be placed on a rotation where a second, more experienced, mud engineer is also on

12   site.  (Id.)  For these rotations, each mud engineer takes charge of the mud for half

13   the day.  (Id.)  While both mud engineers work their shifts unsupervised, the more

14   senior mud engineer is available, if necessary, to provide guidance to the more

15   junior mud engineer when creating treatment plans or responding to various

16   unscheduled events.  (Id.)

17   A mud engineer's experience level, however, does not always dictate the

18   rotation.  Balfour, for example, was the sole mud engineer on site straight out of

19   mud school.  (Balfour Depo. 230:15-24.)  He shadowed the departing mud engineer

20   for a few days and then took charge of the site.  (Id. at 131:15-132:4.)

21   **D.    The Company Man's Experience and Oversight Changes from**
22   **Site-to-Site**

23   The "company man" is the face of the customer and runs the site.  The mud

24   engineer, as the sole M-I SWACO employee on site, must establish a positive

25   relationship with the company man.  The company man relies on the mud engineer

26   to handle all aspects of the drilling fluid, including testing the mud, creating the

27   treatment plan, and responding to unscheduled events.  Much like mud engineers,

28   every company man – and every relationship with the company man – is different, a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

8

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

point which Balfour's testimony confirmed.  (Balfour Depo. 95:23-96:16 ("Q: And how are the company men different?  A:  Actually, they do vary a lot … I guess it really does depend on their background and where they came from"); see also id. at 98:16-20.)  Balfour testified that a company man with experience as a mud engineer was more likely to review and alter a treatment plan.  (Id. at 94:21-25.)  For these company men, it "depends on the personality," but they want to "[k]now exactly what is going on" with the drilling fluid and have specific ideas on the products that should be used.  (Id. at 97:6-22.)  A "new guy" may want to review the treatment plan and possibly involve his supervisor, as he "is going to call his supervisor up for every decision he makes."  (Id. at 96:17-97:5.)  Balfour also testified that his own experience level played a significant role in the way he was viewed by the company man.  (Id. at 99:2-11 ("I personally think [experience] plays a big part because there's company men out there that [] know we're newbies…. [T]hey're not going to listen to us no matter what, you know.  They don't care what we have to say.  Pretty much with decisions, they are not going to listen to us").)

Balfour's experience with the various company men with whom he worked differed significantly.  One company man was "[j]ust always asking questions, questioning everything [he did] … he want[ed] to make all the decisions."  (Id. at 99:23-100:13.)  A different company man would just "look over" Balfour's treatment plan "and say, '[i]f that's what the mud program calls for, then go ahead.'"  (Id. at 103:18-23.)  That company man "had a lot of trust in his mud men" and generally accepted Balfour's recommendations on the drilling fluid.  (Id. at 103:18-104:7.)

### E.   Balfour's Description of His Job Duties Contradicts Other Mud Engineers

Deposition testimony and mud engineer declarations confirm that the manner in which a mud engineer performs his or her job depends greatly on the individual.  For example, former mud engineer Matthew Dewan, the plaintiff in *Dewan v. M-I*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

9

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   *SWACO* (S.D. Tex. Case No. 12-cv-03638),[4] testified clearly to the discretion and

2   independent judgment that he exercised throughout the course of his day.  He

3   testified that he was "in charge of the mud" for all rigs to which he was assigned

4   (Dewan Depo. 95:20-22), that he made decisions as to the proper types and

5   amounts of additives to the mud based on down hole conditions and drafted

6   recommendations for changes to the mud and drilling speeds that he submitted to

7   the company man (Id. at 23:6-7; 57:14-17; 90:3-21; 114:13-18), and that, if

8   warranted, he would recommend changes to the specifications in the engineer's

9   mud program (Id. at 126:13-127:7; 137:8-14), and that his recommendations were

10  usually accepted without question.  (Id. at 95:12-19.)

11          Likewise, other mud engineers state that they are actively monitoring the

12  drilling fluid various ways, identifying trends, synthesizing all of the information at

13  their disposal to figure out what is happening in the well, anticipating what is going

14  to happen in the future, and then determining the right mix of products to add to the

15  fluid to optimize drilling operations and lessen the risk of unscheduled events like

16  taking an oil or gas "kick."  (See, e.g., Cusick Decl., ¶¶ 2-3; Mooren Decl., ¶ 4,

17  Wojciechowicz Decl., ¶ 3.)  Because drilling is so unpredictable, these mud

18  engineers understand that there are no "step-by-step" instructions telling them what

19  to do and, further, that the well – not the "mud program" – dictates how they should

20  be treating the mud.  (See, e.g., Blanton Decl., ¶ 13; Fullmer Decl., ¶ 10; Price

21

22  ────────────

23  [4] Like the *Syed* plaintiffs, Dewan asserts claims for alleged unpaid minimum wage
    and overtime due to his alleged misclassification as an exempt employee.  Although
    originally styled as a proposed collective action, the *Dewan* litigation has proceeded
24  on the plaintiff's individual claims only.  Currently pending before the Texas
    District Court in *Dewan* is M-I Swaco's motion for summary judgment, a copy of
25  which is attached to the concurrently filed declaration of Alexander M. Chemers as
    Exhibit A.  As discussed below, and further shown by the pending motion for
26  summary judgment in *Dewan*, determining whether even a single mud engineer was
27  properly classified as exempt is a fact and labor-intensive process that necessarily
28  requires individualized inquiries.

Morgan, Lewis &
Bockius LLP
Attorneys at Law
Los Angeles

DB2/ 24700688

10

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   Decl., ¶ 8.)  These mud engineers came up with treatment plans that were typically

2   accepted by the company man.  (See, e.g., Marquez Decl., ¶ 5; Pinter Decl., ¶¶ 4-5.)

3          The experience Balfour described while working at his two leases differs

4   significantly from that described by other mud engineers like Dewan.  According to

5   Balfour, his job amounted to mindlessly following a checklist:

6                  "I just follow the program…. [T]hat's really what I do.  I don't

7                  really figure anything out."  (Balfour Depo. 78:2-4.)

8          Indeed, Balfour claims he either followed line-by-line the information

9   contained within the mud program – "[The] mud program tells me everything I

10  need to know about that well to run mud" (Id. at 81:22-82:1); "Q: How do you

11  decide how many bags of different ingredients go in the pill?  A:  Well, when you

12  read the mud program, it tells you how many pounds per barrel" "Q: How do you

13  figure out what ingredients go into the pill?... A: Whatever the mud program says

14  we can put" (Id. at 76:1-11); "Well, if I have to come up with something, then I'm

15  going to refer to the mud manual, the mud program" (Id. at 89:3-14) – or he claims

16  he simply duplicated whatever the other, more experienced, mud engineer working

17  on the site had previously created – "I just mimicked everything that the [other mud

18  engineer] did when he was there during his two weeks on" (Id. at 86:21-87:8; see

19  also 146:12-147:3 (testifying that the company man never "kicked back" his

20  treatment plan because he "was always following" the plan created by the mud

21  engineer who worked the same site); 307:6-13 ("I didn't deviate from [the other

22  mud engineer's] program when I came on the nights").

23         Balfour further testified that he did not engage in some of the most essential

24  functions of his job as a mud engineer.

25         ► He claims he did not perform any technical analysis after testing the

26  drilling fluid.  (See id. at 249:7-251:4 (testifying that he didn't perform any "serious

27  technical analysis"; rather, he "was just logging [his] mud result … and making

28  sure [it was] within specification").)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

11

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1    ► He claims he did not identify trends in the drilling fluid.  (See id. at 252:8-

2    258:7 (testifying that he didn't look for trends in the drilling fluid, he just compared

3    checks and "record[ed] most testing results to satisfy [the] mud program"); 265:15-

4    16 ("The data and trend analysis, again, in my experience, that wasn't something I

5    did")).

6    ► He claims he did not "supervise" rig personnel when they mixed and

7    added products pursuant to his treatment plan; he simply "monitored" them.  (See

8    id. at 249:7-22; 260:10-261:1.)

9    ► He claims he did not determine the cause of any problems with the

10   drilling fluid.  (See id. at 258:12-259:7 ("I never determined the problem … I

11   personally never went out and determined why something happened down there")).

12   ► He claims he did not "determine" the appropriate treatment plan for

13   keeping the drilling fluid within parameters.  (See id. at 259:8-19.)

14   ► He claims he "never made any decisions when it comes to mud weight."

15   (Id. at 143:2-17.)

16   Balfour's testimony suggested that his purported *checklist* approach to his job

17   was due to lack of experience: "[More experienced mud engineers] probably

18   wouldn't have to follow a program as much as maybe someone like myself would

19   because that's a real guidelines for me.  They are going to know all the products out

20   there.  I mean, they are going to know stuff that I never heard of.  I mean Steve [a

21   fellow mud engineer] was just really smart … he would break down … chemical

22   compounds of products.  And I'll be … scratching my head."  (Id. at 119:8-120:3.)

23   Balfour also admitted that his purported experience as a mud engineer differed

24   substantially from his expectations.  (Id. at 145:19-146:10 ("I guess my impression

25   of a mud man was … we're all supposed to go there and make decisions and tell

26   people what to do.  But that's not what it was…. [T]here's nothing I can do that

27   doesn't go by the company man.").)

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

12

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

## III.   PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED

### A.   Rigorous Review Is Needed Before Conditional Certification Is Granted

Contrary to Plaintiffs' suggestion, conditional certification is far from automatic.  As the Supreme Court has explained, the touchstone for court-authorized notice is judicial efficiency.  *See Hoffman-La Roche v. Sperling*, 493 U.S. 165, 170 (1989) (defining the purpose of a collective action as providing the judicial system the benefit of "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [unlawful conduct]").  Thus, although a court has discretion to grant conditional certification, "[t]he relevant inquiry . . . is not whether the court has discretion to facilitate notice, but whether this is an appropriate case in which to exercise that discretion." *Camper v. Home Quality Mgmt., Inc*., 200 F.R.D. 516, 519 (D. Md. 2000).[5]  Here, it would be a poor use of the Court's and the parties' resources to send notice to hundreds or thousands of mud engineers, proceed with months of discovery and motion practice, and ultimately conclude with decertification of a collective action that should not have been certified.  This is why the Court must carefully consider now whether the claims and defenses ultimately will be amenable to resolution based on common proof.

---

[5] *See also Trinh v. JP Morgan Chase & Co*., No. 07-CV-1666 W (WMC), 2008 WL 1860161, *4 (S.D. Cal. Apr. 22, 2008) (denying conditional certification because a collective action would not advance the goal of "judicial economy"); *Smith v. T-Mobile USA, Inc.*, No. CV 05-5274 ABC (SSx), 2007 WL 2385131, *2 (C.D. Cal. Aug. 15, 2007) ("It is within the discretion of the district court to determine whether certification of a § 216(b) collective action is appropriate.").

1      1.      *Even the Lower Standard for Conditional Certification Requires Meaningful Record Evidence that Plaintiffs and The Mud Engineers They Seek to Represent Are Similarly Situated.*

2

3      Plaintiffs suggest that this Court should utilize the two-step approach to

4      conditional certification, and further that the standard at the first step is "lenient"

5      (Mot., 14:14).

6      Even at the first-step, however, Plaintiffs are still required to provide

7      evidentiary support to show that they and the putative collective action members

8      are "similarly situated" with respect to the claims at issue.  *See Colson v. Avnet*, 687

9      F. Supp. 2d 914, 928-929 (D. Ariz. 2010) (observing that a district court "cannot

10     function as a rubber stamp for any and all claims that come its way").  Thus, the

11     Court should examine whether the quantity and quality of evidence establishes "a

12     reasonable basis for [a] claim of *classwide* FLSA violations."  *Colson,* 687 F. Supp.

13     at 927-28 (emphasis added).  In doing so, courts consider: (1) evidence of a

14     pertinent company-wide practice (e.g., common constraints on discretion); (2)

15     similarities among the mud engineers; and (3) the Plaintiffs' reliance on common

16     evidence.  *See Trinh,* 2008 WL 1860161 at *3; *see also Hinojos v. Home Depot,*

17     *Inc.*, No. 2:06-CV-00108, 2006 WL 3712944, *2 (D. Nev. Dec. 1, 2006)

18     ("Although the Court is considering plaintiffs' motion for issuance of nationwide

19     notice at the first tier of the notice process, there is a sufficient evidentiary record to

20     determine whether this action can be managed on a collective basis.").  Here, even

21     applying the alleged "lenient" standard, Plaintiffs have failed to carry their burden,

22     as discussed below in Section III.E.  *See Colson*, 687 F.Supp.2d at 927, 930

23     (denying motion for conditional certification where plaintiff failed to meet

24     evidentiary burden "while apparently resting on the relatively light burden" at the

25     first-step).

26

27

28

2.   *Courts Apply a Stricter Standard for Certification Where, as Here, Considerable Discovery Has Occurred*

Furthermore, in cases "where the parties have had the opportunity to conduct discover on the issue of certification, the similarly situated inquiry is more stringent." *Harris v. Fee Transp. Servs., Inc.*, No. A.3:05CV0077-P, 2006 WL 1994586, *3 (N.D. Tex. May 15, 2006); *see also Pfohl v. Farmers Ins. Group,* No. CV03-3080 DT (RCX), 2004 WL 554834, *3 (C.D. Cal. Mar. 1, 2004). Applying this standard, courts may weigh factors such as the disparate factual and employment settings of class members, the individualized nature of applicable defenses, and fairness and procedural considerations. *Pfohl*, 2004 WL 554834 at *2.

Here, factual determinations regarding mud engineers' varying execution of their duties certainly are possible where the case has been pending for over a year and the parties have engaged in substantial written and deposition discovery, including: (i) depositions of the named Plaintiffs and their declarants regarding their duties, (ii) a Rule 30(b)(6) deposition of M-I SWACO on multiple topics including the duties of the California mud engineers, (iii) the exchange of written discovery responses, and (iv) the production of thousands of pages of documents.

Thus, the Court should more rigorously assess whether Plaintiffs have met their burden to show that they and the putative collective action members are similarly-situated. *See Ugas v. H&R Block Enterprises, LLC*, Case No. CV 09-6510-CAS, 2011 WL 3439219, *11-12 (C.D. Cal. Aug. 4, 2011) (applying "stricter, second-stage scrutiny" because the parties had conducted significant discovery); *Pfohl,* 2004 WL 554834, at *3 (applying stricter, second-step analysis because "the parties do not dispute that discovery had been undertaken relating to the issues of certification"); *Fetrow-Fix v. Harrah's Entertainment, Inc.*, No. 2:10-cv-00560-RLH-PAL, 2011 WL 6938594, *8 (D. Nev. Dec. 30, 2011) (evaluating all discovery in the record where substantial discovery had occurred); *England v. New*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

15

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   *Century Fin. Corp.*, 370 F. Supp. 2d 504, 509 (M.D. La. 2005) ("This case . . . is

2   not in a nascent stage[].  Thus, an application of the second criteria is called for.");

3   *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276-77 (M.D.

4   Ala. 2004) (applying "more rigorous standard" because the rationale for the

5   "lenient standard" disappears once discovery has occurred).  Here, as discussed

6   below, the record evidence confirm that mud engineers worked under disparate

7   employment conditions, requiring individualized inquiries to evaluate the potential

8   exemptions at issue, such that fairness and procedural considerations weigh heavily

9   against conditional certification.

10           **B.      Plaintiffs Have Failed to Meet Their Burden to Demonstrate That**
             **They Were Victims of a Common Unlawful Policy**

11           Regardless of the certification standard, Plaintiffs bear the burden of showing

12  with admissible evidence that they and other mud engineers were "similarly

13  situated" victims of an *unlawful* and *common* policy.  *Trinh*, 2008 WL 1860161 at

14  *3; *Felix v. Davis Moreno Constr., Inc*., No. CV F 07-0533 LJO GSA, 2008 WL

15  4104261, *5 (E.D. Cal. Sept. 03, 2008).

16          Here, Plaintiffs' argument section devotes <u>two</u> sentences to their theory that

17  conditional certification is appropriate, contending that the four declarations they

18  submitted establish a "uniformity of training and job duties all around the United

19  States" and "show[] that the mud men all perform duties requiring no special

20  educational background and according to MI SWACO's step-by-step instructions."

21  (Mot., 14:16-20.)   Mud engineers' purported "job duties," according to Plaintiffs,

22  amount to "tak[ing] samples of drilled mud from mud tanks" and "keep[ing] track

23  of inventory."  (<u>Id</u>. at 5:2-4.)  Plaintiffs' theory of certification fails for two reasons:

24  First, Plaintiffs cannot establish any "common and unlawful policy."  Second, their

25  theory is incapable of common proof.

26          The fact that M-I SWACO has classified the mud engineers as exempt

27  employees is insufficient to establish a "common and unlawful policy."  The FLSA

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

16

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1    does not prohibit an employer from treating a group of employees as exempt;

2    rather, an employer only violates the FLSA where it fails to pay overtime to an

3    employee to whom no exemption applies.  *See* 29 U.S.C. § 207.  Moreover, the

4    mere common classification of employees as exempt is insufficient to support

5    certification.  *See In re Wells Fargo Home Mortgage Overtime Pay Litig*., 571 F.3d

6    953, 959 (9th Cir. 2009) ("The fact that an employer classifies all or most of a

7    particular class of employees as exempt does not eliminate the need to make a

8    factual determination as to whether class members are actually performing similar

9    duties."); *Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 946 (9th Cir.

10   2009) ("Focusing on a uniform exemption policy alone does little to further the . . .

11   assessment of the relationship between individual and common issues.").[6]

12        Further, the court in *Wells Fargo* held that the "blanket application of

13   exemption status, whether right or wrong" is not a policy that warrants class

14   treatment because it "does nothing to facilitate common proof on the otherwise

15   individualized issues," including "the amount of time worked by each [employee],

16   how they spend their time, where they primarily work, and their levels of

17   compensation."  *Id*. at 956-59.  "Whether such a policy [of similar classification] is

18   in place or not, courts must still ask where the individual employee actually spent

19   their time."  *Id*. at 959; *see also Trinh*, 2008 WL 1860161 at *4 ("merely alleging

20   that a class of employees was wrongly designated 'exempt' does not constitute a

21   showing of an unlawful institution-wide policy"); *King v. West Corp*., No.

22   8:04CV318, 2006 WL 118577, *13 (D. Neb. Jan. 13, 2006) ("Merely showing that

23   the employer classified a group of employees as exempt is not sufficient to establish

24   _____

25   [6] Although *Wells Fargo* and *Vinole* arose in the context of motions for class
     certification under Federal Rule 23, courts recognize that "the Ninth Circuit's
26   reasoning is just as relevant for FLSA opt-in class action[s], such as this one."
     *Colson*, 687 F. Supp. 2d at 927 (finding that "mere classification of a group of
27   employees as exempt does not automatically dictate, as a matter of law, whether
     collective action notification is appropriate").

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

17

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

that these employees are similarly situated . . . ."); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1270-71 (M.D. Ala. 2004) (observing that the "decision to classify [a group of employees] as exempt from the FLSA overtime requirements" is not a unifying "policy" because adjudication "requires a fact intensive determination"); *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) ("Adopting Plaintiffs' position would require us to conclude that if an employer has two or more non-officer, salaried employees who allegedly are not being paid overtime as required by the Act, then a collective action would be appropriate under 216(b) . . . .  We do not agree."); *Morisky v. Public Serv. Electric and Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (denying certification where the alleged "'common' . . . 'plan' or 'scheme'" was defendant's "determination that they are exempt").

**C.    Determining Mud Engineers' Exempt Status Necessarily Involves Complex, Individualized Factual Inquiries**

Plaintiffs also cannot demonstrate a common, unlawful policy of classifying mud engineers as exempt because the evaluation of whether each mud engineer is properly classified as exempt is not subject to common proof.

The key legal question here is whether M-I SWACO properly classified mud engineers as exempt under one of the potentially applicable exemptions, including the administrative exemption.  For example, under the administrative exemption, a mud engineer would qualify as exempt if their "primary duty": (1) "is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and (2) "includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a).[7]

---

[7] The first component is satisfied where an employee performs work directly related to assisting with the running or servicing of the business.  29 C.F.R. § 541.201(a). To satisfy the second component ("discretion and independent judgment"), final decision-making power is not required.  A decision "may consist of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

18

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

Here, determining the applicability of the administrative exemption alone will require the Court to make the following individualized inquiries, among others, in order to adjudicate the FLSA claim of each purported member of the collective action:

► The job duties actually performed by the mud engineer on a daily basis, *see Trinh*, 2008 WL 1860161 at *4, *Freeman v. Nat'l Broad. Co.*, 80 F.3d 78, 82-83 (2d Cir. 1996) (recognizing that "factual findings as to the nature of the plaintiffs' employment" is the heart of the overtime-exemption inquiry); *Haines v. Southern Retailers, Inc.*, 939 F. Supp. 441, 447 (E.D. Va. 1996);

► Whether and to what extent the mud engineer has advanced knowledge, licensing, and training, 29 C.F.R. § 541.301(a);

► The importance of each duty performed by the mud engineer, 29 C.F.R. § 541.700(a);

► The time the mud engineer spent performing each of his or her day-to-day tasks, *see, e.g.*, U.S. Department of Labor Opinion Letter, FLSA 2006-11, Mar. 31, 2006; 29 C.F.R. § 541.700(b); *see, e.g.*, *Mike v. Safeco, Ins. Co. of America*, 274 F. Supp. 2d 216, 220-21 (D. Conn. 2003) (determining whether an employee is exempt requires a "'detailed analysis of the time spent performing administrative duties'" (quoting *Cooke v. General Dynamics Corp*., 993 F. Supp. 56, 59-61 (D. Conn. 1997)); *In re Wells Fargo*, 571 F.3d at 959; *Vinole*, 571 F.3d at 946; *Williams v. Lockheed Martin Corp.*, No. 09cv1669 WQH (POR), 2011 WL 2200631, *8 (S.D. Cal. June 2, 2011) (exemption "turns on the amount of time spent . . . on certain tasks making individualized inquiries necessary");

► Whether and to what extent the mud engineers' job duties involved the

---

recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c).   Whether this component is satisfied must be determined "in the light of all the facts involved in the particular employment situation in which the question arises."  29 C.F.R. § 541.202(b).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

19

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   exercise of discretion and independent judgment, 29 C.F.R. § 541.200(a)(2)-(3);

2   § 541.202(b);

3   ► Whether and to what extent the mud engineers' job duties involved the

4   "comparison and the evaluation of possible courses of conduct and acting or

5   making a decision after the various possibilities have been considered," 29 C.F.R. §

6   541.207(a); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374 (7th Cir.

7   2005); *Koppinger v. American Interiors, Inc.*, 295 F. Supp. 2d 797, 802 (N.D. Ohio

8   2003) (observing that the plaintiff's work "range from investigating problems, to

9   considering possible solutions and implementing, in plaintiff's opinion, the best

10  solution");

11  ► Whether and to what extent a mud program at a specific rig prevented

12  a mud engineer from exercising discretion and independent judgment, *see Kennedy*,

13  410 F.3d at 375 ("The fact that they look to past work packages for guidance and

14  use a computer to aid their recommendations does not transform them into

15  automatons."); and

16  ► Whether and to what extent the mud engineers' job duties involved the

17  performance of work directly related to the management or general business

18  operations of the company, 29 C.F.R. § 541.200(a)(2)-(3); 69 Fed. Reg. 22122,

19  22142 (Apr. 23, 2004) ("Each case must be examined individually.").

20  As discussed in *Trinh,* the "similarly situated" inquiry requires plaintiffs to

21  show how common evidence could be used to prove each employee's exempt

22  status, and the absence of common evidence "necessarily involves a fact-by-fact

23  inquiry into the circumstances of each employee." *Trinh,* 2008 WL 1860161 at *4.

24  Thus, courts routinely deny conditional certification of misclassification claims,

25  particularly where it is clear (as here) that the exemption analysis will require

26  individualized inquiries.[8]

27  _____

28  [8] *See also Pfohl,* 2004 WL 554834 at *11; *Armstrong v. Weichert Realtors*, No. 05-3120 (JAG), 2006 WL 1455781, *2 (D.N.J. 2006); *Aguirre v. SBC Commc'ns, Inc.*,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

20

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

### D.     The Evidence Shows that Plaintiffs and Their Declarants Are Not Similarly Situated to One Another

Relying on just four largely duplicative declarations, including two from Syed and Balfour, Plaintiffs argue they are "similarly situated" to hundreds or thousands of current and former mud engineers who worked at numerous locations throughout the United States.  As an initial matter, Plaintiffs, who only worked in California, have no basis for asserting a collective action on behalf of individuals

---

No. H-05-3198, 2007 WL 772756, *15 (S.D. Tex. Mar. 12, 2007) (denying FLSA conditional certification "[g]iven the fact-intensive nature of the exemption analysis"); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005) (same because "individual inquiries must predominate in this case because of the different locations, managers, and factual situations involved"); *Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (same because "liability depended on an individual determination of each employee's duties"); *Wombles v. Title Max of Alabama, Inc.*, No. 303CV1158CWO, 2005 WL 3312670, *5-6 (M.D. Ala. Dec. 7 2005) (same because "the court would have to inquire into each employee's daily job duties"); *Tyler v. Payless Shoe Source, Inc.*, No. 2:05-CV-33F(WO), 2005 WL 3133763, *5 (M.D. Ala. Nov. 23, 2005) (same because "at the very least, the Court would have to inquire as to each employee's average daily job duties"); *Diaz v. Electronics Boutique of America, Inc.*, No. 04-CV-0840E(SR), 2005 WL 2654270, *6-7 (W.D.N.Y. Oct. 17, 2005) (same where "individual factual determination is necessary to distinguish between exempt and nonexempt employees"); *Holt*, 333 F. Supp. 2d at 1274-75 (same because court "would have to inquire at a second stage as to the daily tasks of each putative collective action member"); *Clausman v. Nortel Networks, Inc.*, No. IP 02-0400-C-M/S, 2003 WL 21314065, *5 (N.D. Ind. May 1, 2003) (same because "the Court will be required to make a fact-intensive inquiry into each potential plaintiff's employment situation"); *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 943 (D. Ark. 2003) (denying FLSA conditional certification due to inquiry to fact-intensive inquiry); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (same because claims "turn upon evidence relating to [individual employees'] day-to-day tasks"); *Dean v. Priceline.com, Inc.*, No. 3:00CH273 (DJS), 2001 WL 35961086, *2-3 (D. Conn. June 6, 2001) (same because exemption determination requires individual analyses of each employee's job responsibilities); *see also England*, 370 F. Supp. 2d at 511 (denying motion for conditional certification because it was "clear that individual issues must predominate in this case because of the different locations, managers, and factual situations involved at each location").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

21

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   who worked throughout the United States.[9]

2          Moreover, as shown by their sworn testimony, Syed and Balfour are not even

3   "similarly situated" to one another, let alone their two declarants, let alone mud

4   engineers who worked throughout the United States under very different

5   circumstances.

6          For instance, despite misleadingly referring to himself as a "mud man" in his

7   declaration,[10] Syed never even made it to mud school, and admitted at his

8   deposition that he never actually worked as a mud engineer.  (Syed Depo. 150:19-

9   22 ("Q: [I]n your mind, did you ever actually work as a drilling fluid specialist?  A:

10  No, sir."); see also Balfour Depo. 45:16-20 (agreeing that he "wouldn't give [Syed]

11  the title of mud man").)  Thus, Syed is not "similarly situated" to Balfour, or vice

12  versa.  And Syed is clearly not "similarly situated" to the non-party mud engineers

13  whose interests he seeks to represent.  *Cf. Colson*, 687 F. Supp. 2d at 928-929

14  (concluding that evidence, including declaration from employee who "was never

15  even employed by Defendant as an SMR," did "not come close to establishing" that

16  employees were similarly situated).

17         Not only are Syed and Balfour not "similarly situated" to one another, they

18  are not "similarly situated" to their own declarants.  For instance, Balfour testified

19  that he did not make any decisions because he either "just follow[ed]" the mud

20  program or simply duplicated the treatment plan that the other, more experienced

21  mud engineer working on the site had previously created.  (See, e.g., Balfour Depo.

22  _____

23  [9] To the extent Plaintiffs have provided information relating to M-I Swaco's
    employment practices outside of the State of California, such information is based
24  on their unfounded speculation.  *See* Defendant's Objections to Evidence Submitted
    in Support of Plaintiffs' Motion for Conditional Certification.  Such declarations
25  have "no probative value in establishing that [they], along with other [DFSs] across
    the country, 'were together the victims of a single decision, policy, or plan.'"
26  *Colson*, 687 F. Supp 2d at 929 (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267
    F.3d 1095, 1102 (10th Cir. 2001).
27
    [10] *See, e.g.,* Syed Decl., ¶ 5 ("I and the other mud men . . .").
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

22

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

78:2-4; 81:22-82:1; 86:21-87:8; 146:12-147:3.)  In contrast, Plaintiffs' declarant Adam Doherty testified that the mud program did not address every situation, and further that he would use his judgment to come up with recommendations, which he would then present to the company man and that the company man would generally accept.  (Doherty Depo. 20:7-11, 60:16-62:17.)  Doherty also testified, unlike Balfour, that the treatment plans reflected decisions he had made throughout the day.  (Id. at 108:23-109:1.)

Unlike Syed and Balfour, Doherty was not employed by M-I SWACO as a Drilling Fluid Specialist.  Rather, he was a "consultant," a more experienced mud engineer who was engaged through a third party.  (Stanfield Decl., ¶ 14.)  At his deposition, Doherty testified that his years of experience allowed him to make the kinds of recommendations that a more inexperienced mud engineer like Balfour claims he did not make.  (See Doherty Depo. 47:9-49:6.)  Further, as shown by his declaration, Doherty was paid differently than Balfour and Syed, receiving a hefty daily rate of $680.  (Crane Decl., ¶ 19.)[11]

**E.   The Evidence Shows that Plaintiffs Are Not Similarly Situated to other Mud Engineers, Whose Duties Vary in Ways Material to the Potential Exemptions**

As shown by the above examples, Syed and Balfour are not "similarly situated" to one another or to their own declarants.  And they certainly are not "similarly situated" to every member of the proposed collective action, as shown by the testimony and statements of current and formers mud engineers. *See* Defendant's Appendix of Evidence, Exs. 1-10.

---

[11] Through their Motion, Plaintiffs ask that the Court conditionally certify a class that includes not only the mud engineers who actually worked for M-I SWACO, but also consultants like Doherty who worked for third parties.  As shown by the above discussion, the differences between Plaintiffs and these consultants are heightened, including the consultants' greater level of experience, differenct compensation schemes, etc.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

23

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

Here, the record evidence confirms that a mud engineer's primary responsibility is analyzing the drilling fluid and preparing and recommending treatment plans to the company man.  See, e.g., Blanton Decl., ¶ 3; Croy Decl., ¶ 2; Cusick Decl., ¶¶ 2-3; Fullmer Decl., ¶ 4 ("As a mud engineer, my primary responsibility was monitoring the drilling fluid throughout the day and then, depending upon what I had observed, formulating a plan for how to tweak the mud to deal with what was happening downhole."); Marquez Decl., ¶¶ 2-3; Mooren Decl., ¶ 4, Pinter Decl., ¶ 4 ("I am analyzing the results, trying to figure out what is happening downhole, and then coming up with a plan for how to treat the mud"); Price Decl., ¶ 2; Wojciechowicz Decl., ¶ 3.; see also Crane Depo 162:11-15 ("Q: As a Drilling Fluid Specialist I was your primary responsibility to advise clients on potential treatments or improvements to the mud system based on data analysis and testing?  A:  Yes.").

Plaintiffs ignore this primary function, instead focusing on the mud engineer's alleged "job duties" of "tak[ing] samples of drilled mud from mud tanks" and "keep[ing] track of inventory" according to alleged "step-by-step instructions" (Mot., 5:2-4; 14:16-20).[12]  However, it is this primary function that

---

[12] Contra Blanton Decl., ¶ 9 (just running mud checks is "not what I do, nor do I think that is what a Drilling Fluid Specialist should be doing.  Rather, it's my job to interpret the tests (again, using other information at my disposal), figure out what is going on, choose which of the several different courses of action generally available to me makes the most sense, and then either implement the solution on my own or recommend the solution to the company man."); Cusick Decl., ¶ 3 ("[M]y job isn't just running mud checks and logging those numbers so other people can make decisions. . . . it's my job as a mud engineer to use the information that I've gained from various sources (including not just the mud check but my own observations, discussions with other rig personnel, etc.) to come up with a treatment plan that will get the mud where it needs to be to perform all of its functions."); Mooren Decl., ¶ 3 ("All the mud check tells you is if a property is too high or too low – it's up to the mud man to come up with a solution to get the mud back within the preferred range.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

24

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1    makes a conditional class in this matter impossible to certify.[13]  Mud engineers

2    exercise their discretion and independent judgment in an ever-changing and

3    dynamic environment, working different rotations, at any of thousands of different

4    sites throughout the country, for hundreds of different company men, while dealing

5    with countless different geological formations and responding to any number of

6    daily "unscheduled" events.  As the sole M-I SWACO employee working on site,

7    and in the midst of ever-changing circumstances, they monitor the drilling fluid,

8    analyze its contents, and then create, recommend, and implement "treatment plans"

9    that ensure the drilling fluid's optimal performance.  To the extent a particular mud

10   engineer, on any particular day, executed his or her responsibilities by following

11   "step-by-step instructions" sufficient to invalidate the exemption, the inquiry to

12   reach any such finding is highly individualized.

13              1.    *Every Site Is Different*

14        Every site is different, and the circumstances a mud engineer addresses

15   change daily.  Each well sits atop a unique geological formation that creates

16   conditions to which the mud engineer must react.  Mud engineers may spend the

17   bulk of their day responding to "unscheduled events," like "lost circulation,"

18   "blowouts," or taking on water.  (Balfour Depo. 73:3-6.)  Operations may be

19   smooth on other days, with mud tests showing that the drilling fluid remains within

20   expected parameters such that the treatment plan can go largely unchanged.  But

21   every day's circumstances will be different, and the amount of time a mud engineer

22   _____

23   [13] Not only do Plaintiffs fail to address the mud engineers' primary function, their
     conclusory job description is contradicted by evidence in the record.  For instance,
24   Plaintiffs' declarant Alan Crane admitted that he worked on an experimental well
     and in an office for several months.  (Crane Depo. 108:16-21; 158:12-24.)
25   Likewise, mud engineer Seth Croy worked in a laboratory, running sophisticated
     tests.  (Croy Decl., ¶ 9.)  And former mud engineer Benjamin Fullmer worked as a
26   field supervisor.  (Fullmer Decl., ¶ 14.)  None of those jobs would have required the
     mud engineer to "take samples of drilled mud from mud tanks" or "keep track of
27   inventory."
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

25

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1  spends on any particular task – and the *nature* of that task – will change daily as
2  well.  (See, e.g., Cusick Decl., ¶ 4 ("[E]ven in an area that is well explored, you
3  never know exactly what you are going to encounter until you start drilling.");
4  Fullmer Decl., ¶¶ 10-11 ("Every well is different, and every foot of well can be
5  different, which required me to use discretion and independent judgment as a DFS
6  to determine what the right mix of mud was for a particular well, at that particular
7  depth, at that particular moment, and in response to any particular situations that
8  arose.").)

9           2.      *Every Company Man Is Different*

10          Every company man is different.  Balfour testified that every company man
11  handles the role differently.  He may "micro-manage" the mud operations,
12  reviewing the treatment plan and directing the mud engineer to make changes.  Or
13  he may routinely accept without question the plan the mud engineer recommends.
14  (Balfour Depo. 99:23-100:13; 103:18-104:7.)

15          Balfour's contention is that the company man makes all the decisions, and
16  the mud engineer is simply relaying information.  But Balfour's own testimony
17  makes it clear that the company man's involvement with the plan – or lack thereof –
18  is wholly dependent on the actual company man, who changes with every location.
19  Accordingly, whether a particular mud engineer's discretion and independent
20  judgment is nullified by a micromanaging company man is a highly individualized
21  inquiry that requires examination of the company man, the mud engineer, and the
22  relationship between the two.  (See, e.g., Fullmer Decl., ¶ 8; Marquez Decl., ¶ 5;
23  Pinter Decl., ¶¶ 5-7.)

24  / / / /
25  / / / /
26  / / / /
27  / / / /
28  / / / /

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

26

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

3. *Every Mud Engineer's Experience And Ability Are Different*

Every mud engineer's experience and ability are different. Plaintiffs' contention is that mud engineers execute their duties by following "step-by-step" instructions. In this regard, Balfour, testified that he never strayed from the mud program's contents such that it amounted to, essentially, a checklist. (Balfour Depo. 78:2-4.) But his testimony contradicts the written statements of other mud engineers and the testimony of the plaintiff in *Dewan* and Plaintiffs' own declarant. These mud engineers confirm that the mud program exists merely as a guideline, and that they use their discretion and independent judgment to apply the mud program to various geological formations and "unscheduled events" that they face throughout the day. (See, e.g., Croy Decl., ¶ 7 ("many of the guidelines in a mud program have discretion built into them," including action which should be taken "as needed," requiring the mud engineer to exercise discretion); Fullmer Decl., ¶¶ 9-10; (a mud engineer must "pay attention to the well and determine if the well is faced with a situation that requires a mud plan that deviates from the suggested properties"); Mooren Decl., ¶ 5 (mud program "is only a guideline"); Price Decl., ¶ 7 ("the hole – not the mud program – dictates what your mud's properties need to be"); see also Dewan Depo. 118:11-23 ("Q… you're going to have to make those balancing tradeoffs in terms of which chemicals to put in; right? A: Yeah. Q: Do you know of anywhere within a manual that specifies how you're supposed to do that balancing? … A: No, I'd say probably not. I mean other than just experience of doing it"); 119:1-3 ("Q: You have to basically base [your choice of chemical] on your experience and your own judgment; right? A: Yes"); Doherty Depo. 20:7-11, 60:16-62:17.)

Even Balfour admitted that more experienced mud engineers moved beyond the mud program when creating their plans. (Balfour Depo. 119:13-120:9 (testifying that "they probably wouldn't have to follow a program as much as someone as myself would because that's a real guideline for me").) Thus, to the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

27

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1   extent a mud engineer uses the mud program as a checklist (and, as Plaintiffs would

2   have it, removes the element of discretion and independent judgment), such a

3   finding would require an individualized inquiry into the particular mud engineer's

4   experience and ability.  (See also Doherty Depo. 52:2-5 (testifying that less

5   competent mud engineers were typically ones with less experience); Cusick Decl., ¶

6   8 ("As an experienced DFS, I work very independently."); Pinter Decl., ¶ 6 ("The

7   more experienced you are, the more likely it is that the company man will take your

8   suggestions.")

9       Further, Balfour testified that his treatment plans were either (1) simply

10   regurgitations from the mud program or (2) a duplication of other treatment plans

11   that another, more experienced, mud engineer had already prepared.  (Balfour

12   Depo.  76:1-11; 86:21-87:8; 146:12-147:3; 307:6-13.)  Clearly, to the extent one

13   mud engineer exercises discretion in creating a treatment plan while the other

14   simply duplicates the final product, the level of discretion and independent

15   judgment greatly differs for each.  To determine whether a mud engineer is a

16   "creator" or "duplicator" requires a highly individualized inquiry into every mud

17   engineer's practice.

18              4.    *Mud Engineers Work Different Rotations*

19       Mud engineers work different rotations.  In some cases, mud engineers, like

20   Balfour, are assigned as the sole mud engineer on site.  In other cases, two mud

21   engineers are assigned to the same site, with each overseeing mud operations for

22   half the day.  While both mud engineers are "in charge" of the drilling fluid during

23   their respective shifts, the more senior mud engineer is available to provide

24   guidance, when needed.  In yet other cases, mud engineers conduct "drive bys,"

25   visiting multiple sites throughout the day, dealing with multiple company men, and

26   analyzing the drilling fluid for multiple wells and formations.  Each one of these

27   rotations presents a varying set of factors that impacts the exemption analysis.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

28

DB2/ 24700688

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS

1       As shown by the concurrently filed deposition transcripts and declarations

2   from proposed collective action members, Plaintiffs' description of the mud

3   engineers' "job duties" is both conclusory and inaccurate.  However, the Court does

4   not need to look any further than Balfour's own deposition transcript, which

5   confirms the kinds of individualized inquiries needed to determine whether or not

6   an individual mud engineer was properly classified as exempt, including factors

7   such as the mud engineer's level of experience, their relationship with the company

8   man, their rotation, and the type of well they were assigned to.

9   **IV.   <u>CONCLUSION</u>**

10       The mere fact that mud engineers are classified as exempt is not evidence of

11   a common and unlawful policy, which is required to conditionally certify a

12   collective action.  Plaintiffs have failed to meet their burden to show that they are

13   "similarly situated" to every mud engineer.  Given the variation in mud engineers'

14   job duties and the time spent on those duties, it would be impossible to collectively

15   litigate the exempt status of each mud engineer, which will turn on individualized

16   evidence.  Therefore, the Court should deny Plaintiffs' Motion.  Alternatively, if the

17   Court grants conditional certification and authorizes notice, it should order the

18   parties to meet and confer concerning the content of the notice and process for its

19   distribution.[14]

20   Dated:    February 21, 2014      MORGAN, LEWIS & BOCKIUS LLP

21

22         By    /s/ Alexander M. Chemers

23         ALEXANDER M. CHEMERS
      Attorneys for Defendant

24         M-I L.L.C.

25

26

27   _____

28   [14] *See, e.g., Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 993 (C.D. Cal. 2006) (directing the parties to meet and confer and agree to a form of notice).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

DB2/ 24700688

29

OPPOSITION TO MOTION FOR
CONDITIONAL CERTIFICATION
CASE NO. 1:12-CV-01718-AWI-MJS