IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SARMAD SYED and ASHELY BALFOUR, individually, and on behalf of all others similarly situated,**<br><br>                                    Plaintiffs,<br><br>             **v.**<br><br>**M-I, L.L.C.,**<br><br>                                    Defendant. | 1:12-cv-01718 AWI MJS<br><br>**FINDINGS AND RECOMMENDATION TO GRANT MOTION FOR COLLECTIVE CERTIFICATION**<br><br>**(ECF No. 12)** |

Sarmad Syed and Ashley Balfour ("Plaintiffs"), on behalf of themselves and classes of those similarly situated, move the Court to conditionally certify a collective action for Plaintiffs' federal wage and hour claim pursuant to 29 U.S.C. § 216(b). (ECF No. 12.) Defendant M-I, L.L.C. ("M-I") filed an opposition on February 21, 2014. (ECF No. 21.) Plaintiffs filed a reply on March 7, 2014. (ECF No. 22.) On March 26, 2014, the Court took the matter under submission without oral argument. Accordingly, the matter stands ready for adjudication.

I.    <u>**BACKGROUND**</u>

A.    **Procedural History and the Instant Motion**

On October 18, 2013, Plaintiffs filed this putative class action against M-I, seeking to represent a collective action class of employees under the Federal Labor Standards

1

1   Act ("FLSA"), and a California class of employees under California law. (ECF  No. 1.)

2   Plainitffs allege (1) violations of FLSA, 29 U.S.C. §§ 201, et seq.; and (2) violations of

3   various California state laws. (Id.) On December 7, 2012, Defendant filed its answer to

4   the complaint. (ECF No. 8.)

5        In the instant motion, Plaintiffs seek conditional certification of a FLSA collective

6   action to permit court-authorized notices to be sent to potential opt-in Plaintiffs. Plaintiffs

7   assert that M-I violated FLSA by misclassifying them as exempt from overtime pay

8   requirements and thus denying them overtime compensation to which they were entitled.

9   (Compl.  ¶¶ 36-44; Mot. at 1.) The class Plaintiffs propose for their FLSA collective

10  action consists of:

> All persons who were, are, or will be employed by Defendant, on or after
> the date that is three years before the issuance of an Order authorizing
> Notice (the "FLSA Class Period"), in the job position known as drilling
> fluids specialist ("DFS"), "mud engineer," "mud man," "mud man trainee,"
> or "consultant mud man," or equivalent titles (the "FLSA Collective
> Plaintiffs").

15  (See Mot. at 8.) Plaintiffs seek an order (1) conditionally certifying the proposed FLSA

16  class, (2) requiring M-I to produce an updated class list to Plaintiffs' counsel, and (3)

17  directing the dissemination of the notice of the pendency of the action. (Id.)

18  **B.      Factual Summary and Evidence Submitted by Both Parties**

19       Defendant M-I "employs more than 13,000 individuals in more than 75 countries

20  around the world" and "provides services and products related to drilling for

21  hydrocarbons." (Compl. ¶ 15.) Named plaintiff Sarmad Syed was a "mud engineer" in

22  training and Ashely Balfour is a "mud engineer." (Id. ¶ 16.) "Mud engineers" or "Mud

23  men" are industry terms to describe drilling fluids specialists.

24       As alleged by Plaintiffs, 'mud' is the term used throughout the oil drilling industry

25  to refer to fluids used in drilling.  They consist of a variety of different substances, not

26  necessarily actual mud. (Mot. at 2.) Mud engineers take samples from the drilling fluid

27  tank at a drilling site, known as a "mud tank," and test the fluids. Mud engineers were not

28  required to have specialized educational backgrounds, but instead attend a two-month

1  training course in Houston, Texas. (Mot. at 4.)

2        Plaintiffs contend that mud engineers all had the same basic job duties: sampling
3  the drilling fluid contained in mud tanks to determine whether it was within the
4  specifications set forth by Defendant; keeping track of inventory; and reporting to the
5  'company man,' who supervised the drilling rig.

6        The complaint alleges that mud engineers were employed to work for either
7  twelve or twenty-four hour shifts, but were generally not allowed to leave the worksite
8  (usually a trailer) when not on shift. (Compl. ¶¶ 16-17; Mot. at 5-6.) Further, mud
9  engineers may be called upon to work while not on shift. (Id.) Mud engineers were paid
10 fixed monthly salaries, and were not paid for overtime, travel time, or for missed breaks.
11 (Mot. at 6-7.)

12        In support of the motion, Plaintiffs provide the declaration of named plaintiffs
13 Ashely Balfour (ECF No. 12-3) and Sarmad Syed (ECF No. 12-4) and former employees
14 of M-I, Alan Crane (ECF No. 12-5) and Adam Doherty (ECF No. 12-6). Further, in
15 support of the reply brief, Plaintiffs provide the job descriptions of the various drilling fluid
16 specialist positions [1] and excerpts of the deposition testimony of the Plaintiffs and
17 Defendant's corporate representative, Reginald Stanfield. (See ECF No. 22.)

18        In opposition, Defendant provides the declarations of eight mud engineers
19 employed by M-I, and excerpts of five depositions of other mud engineers who worked
20 for Defendant, including the named Plaintiffs. (See ECF No. 21.)

21    **C.    Plaintiffs' Claim**

22        As the instant motion relates only to the first claim of the complaint for the 'opt-in'
23 FLSA claim, the Court shall only address the contentions set forth with regard to that
24 claim. Plaintiffs allege that Defendant has "common policies, programs, practices,
25 procedures, protocols, routines, and rules of willfully failing and refusing to pay the
26 Covered Employees at time and a half rates for work in excess of forty (40) hours per

27 _____

28      [1] The positions include drilling fluid specialist I through IV, and drilling fluid specialist senior positions.

workweek, and willfully failing to keep records required by the FLSA, and willfully failing and refusing to pay the Covered Employees at overtime rates, or at all, for off-the-clock work." (Compl. ¶ 40.) Plaintiffs allege that "[t]hroughout the FLSA Class Period, Plaintiffs and the other Covered Employees regularly worked in excess of forty (40) hours per workweek" and that Defendants "willfully, regularly and repeatedly failed" to pay Plaintiffs and the other Covered Employees overtime for the excess hours worked. (Id. ¶¶ 39, 41.) Plaintiffs also allege that Defendant did not keep or preserve accurate time records as required by the FLSA. (Id. ¶ 43.) Defendant generally contends that the Plaintiffs and covered employees fall under the administrative exemption and are not entitled to hourly wages. See  29 C.F.R. § 541.200; Opp'n at 18-20.

## II.   LEGAL STANDARD

The FLSA requires employers to pay covered employees overtime compensation of one and one-half times the regular rate of pay for all hours worked in excess of forty hours per week, unless an exemption applies. 29 U.S.C. § 207(a)(1). To ensure compliance with this requirement, the FLSA authorizes actions by employees to recover unpaid overtime wages and an equal amount as liquidated damages for violation of the FLSA's overtime provisions. 29 U.S.C. § 216(b).

In addition to bringing individual suits, FLSA allows employees to bring a collective action on behalf of other "similarly situated" employees based on alleged violations of FLSA.[2] 29 U.S.C. § 216(b).[3] In contrast to class actions pursuant to Federal

---

[2] The Supreme Court has held that collective actions allow aggrieved employees "the advantage of lower individual costs to vindicate rights by the pooling of resources." Hoffmann—LaRoche v. Sperling, 493 U.S. 165, 170, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989) (discussing collective action provision, 29 U.S.C. § 216(b), in context of ADEA claims). The judicial system also benefits from the "efficient resolution in one proceeding of common issues of law and fact arising from the same" unlawful activity. Id. Those benefits may only be realized through "accurate and timely notice concerning the pendency of the collective action, so that [employees] can make informed decisions about whether to participate." Id.; see also McElmurry v. U.S. Bank N.A., 495 F.3d 1136, 1139 (9th Cir. 2007). Notice "serve[s] the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." Hoffmann—La Roche, 493 U.S. at 172.

[3] Section 216(b) states in part: "An action to recover the liability [for unpaid overtime wages and liquidated damages] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or
(continued…)

4

1   Rule of Civil Procedure 23, potential members of a collective action under FLSA must

2   "opt-in" to the suit by filing a written consent with the Court in order to benefit from and

3   be bound by a judgment. Id.; Leuthold v. Destination America, Inc., 224 F.R.D. 462, 466

4   (N.D. Cal. Aug. 16, 2004). Employees who do not opt-in may bring a subsequent private

5   action. Id. (citing EEOC v. Pan Am. World Airways, Inc., 897 F.2d 1499, 1508 n.11 (9th

6   Cir. 1990)). The determination of whether a collective action under FLSA is appropriate

7   is within the Court's discretion. See Adams v. Inter—Con Security Sys., Inc., 242 F.R.D.

8   530, 535 (N.D. Cal. Apr. 11, 2007). The plaintiff bears the burden to show that he and

9   the proposed class members are "similarly situated." See id. (citing 29 U.S.C. § 216(b)).

10   The FLSA does not define "similarly situated." Although the Ninth Circuit has not

11   yet articulated the proper test for certification of a FLSA action, district courts in this

12   Circuit generally apply a two-step inquiry. See, e.g., Leuthold, 224 F.R.D. at 466-67;

13   Adams, 242 F.R.D. at 536.[4] Under the first step, the court makes an initial "notice-stage"

14   determination of whether potential opt-in plaintiffs are similarly situated to the

15   representative plaintiffs, determining whether a collective action should be certified for

16   the sole purpose of sending notice of the action to potential class members.[5] Id. For

17   conditional certification at the notice-stage, courts require little more than substantial

18   allegations, supported by declarations or discovery, that "the putative class members

19   were together the victims of a single decision, policy, or plan." Villa v. United Site

20   Services of Ca., No. 5:12-CV-00318-LHK, 2012 U.S. Dist. LEXIS 162922, 2012 WL

_____

(…continued)

themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

[4] Use of this two-tiered approach has been affirmed by five United States Courts of Appeals. See White v. Baptist Memorial Health Care Corp., 699 F.3d 869, 877 (6th Cir. 2012); Myers v. Hertz Corp., 624 F.3d 537, 554-55 (2d Cir. 2010); Sandoz v. Cingular Wireless LLC, 553 F.3d 913, 915 n.2 (5th Cir. 2008); Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260 (11th Cir. 2008); Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1105 (10th Cir. 2001).

[5] The sole consequence of conditional certification is the "sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court, § 216(b)." Genesis Healthcare Corp. v. Symczyk, 133 S. Ct. 1523, 185 L. Ed. 2d 636 (2013).

5503550, at *13 (N.D. Cal. Nov. 13, 2012) (citation omitted); <u>see also</u> <u>Morton v. Valley</u> <u>Farm Transport, Inc.</u>, No. C-06-2933-SI, 2007 U.S. Dist. LEXIS 31755, 2007 WL 1113999, at *2 (N.D. Cal. Apr. 13, 2007) (describing burden as "not heavy" and requiring plaintiffs to merely show a "reasonable basis for their claim of class-wide" conduct) (internal quotation marks and citation omitted); <u>Stanfield v. First NLC Financial Servs.</u>, LLC, No. C-06-3892-SBA, 2006 U.S. Dist. LEXIS 98267, 2006 WL 3190527, at *2 (N.D. Cal. Nov. 1, 2006) (holding that the plaintiffs simply "must be generally comparable to those they seek to represent."). All that need be shown is that "some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA." <u>Russell v. Wells Fargo & Co.</u>, No. 07-CV-3993-CW, 2008 U.S. Dist. LEXIS 78771, 2008 WL 4104212, at *3 (N.D. Cal. Sept. 3, 2008).[6] The standard for certification at this stage is a lenient one that typically results in certification. <u>Kress v. PricewaterhouseCoopers, LLP</u>, 263 F.R.D. 623, 627-628 (E.D. Cal. 2009) (citing <u>Wynn v. Nat'l Broad. Co., Inc.</u>, 234 F.Supp.2d 1067, 1082 (C.D. Cal. 2002)). It is met by a showing that plaintiffs were subject to the same FLSA exemption classification and performed similar job duties. <u>See, e.g.</u>, <u>Kress</u>, 263 F.R.D. at 629-30. As a practical matter, "[a]t this stage of the analysis, courts usually rely only on the pleadings and any affidavits that have been submitted." <u>Leuthold</u>, 224 F.R.D. at 468. Plaintiffs need not conclusively establish that collective resolution is proper, because a defendant will be free to revisit this issue at the close of discovery. <u>Kress</u>, 263 F.R.D. at 630.

At the second step of the two-step inquiry, "the party opposing the certification may move to decertify the class once discovery is complete." <u>Adams</u>, 242 F.R.D. at 536 (citation omitted); <u>Escobar v. Whiteside Constr. Corp.</u>, No. C 08-01120 WHA, 2008 U.S.

---

[6] The "similarly situated" requirement is "considerably less stringent than the requirement of Fed. R. Civ. Proc. 23(b)(3) that common questions predominate." <u>Church v. Consol. Freightways, Inc.</u>, 137 F.R.D. 294, 305 (N.D. Cal. Apr. 12, 1991) (citation omitted); <u>Villa</u>, 2012 U.S. Dist. LEXIS 162922, 2012 WL 5503550 at *14 ("[A] collective action does not require a showing that common claims predominate").

1    Dist. LEXIS 68439, 2008 WL 3915715, at *3 (N.D. Cal. Aug 21. 2008) ("Certification is

2    called 'conditional' during the first stage because the opposing party could always

3    (successfully) move for decertification."). "[T]he Court then determines the propriety and

4    scope of the collective action using a stricter standard." <u>Stanfield</u>, 2006 U.S. Dist. LEXIS

5    98267, 2006 WL 3190527, *2. At that point, "the court may decertify the class and

6    dismiss the opt-in plaintiffs without prejudice." <u>Leuthold</u>, 224 F.R.D. at 467. It is at the

7    second stage that the Court makes a factual determination about whether the plaintiffs

8    are actually similarly situated by weighing such factors as: "(1) the disparate factual and

9    employment settings of the individual plaintiffs; (2) the various defenses available to the

10   defendants with respect to the individual plaintiffs; and (3) fairness and procedural

11   considerations." <u>Id.</u> Even at this second stage, the standard courts apply is different, and

12   easier to satisfy, than the requirements for a class action certified under Federal Rule of

13   Civil Procedure 23(b)(3). <u>Lewis v. Wells Fargo & Co.</u>, 669 F.Supp.2d 1124, 1127 (N.D.

14   Cal. 2009).

15       Courts have emphasized that a fairly lenient standard is used at the notice-stage

16   step because a court does not have much evidence at that point in the proceedings —

17   just the pleadings and any declarations submitted. In contrast, at the second step, a

18   stricter standard is applied because there is much more information available, "which

19   makes a factual determination possible." <u>Vasquez v. Coast Valley Roofing, Inc.</u>, 670

20   F.Supp.2d 1114, 1123 (E.D. Cal. 2009); <u>see also</u> <u>Labrie v. UPS Supply Chain Solutions,</u>

21   <u>Inc.</u>, No. C 08-3182 PJH, 2009 U.S. Dist. LEXIS 25210, 2009 WL 723599, at *4 (N.D.

22   Cal. Mar. 18, 2009) (noting that the first step "is characterized by a fairly lenient

23   standard, necessitated by the fact that not all discovery will have been completed at the

24   time of the motion," while, at the second step, "the court engages in a more stringent

25   inquiry into the propriety and scope of the collective action" because "discovery is

26   complete and the case is ready to be tried").

27       In considering whether the lenient notice-stage standard has been met in a given

28   case, courts bear in mind that plaintiffs need not submit a large number of declarations

1  or affidavits to make the requisite factual showing that class members exist who are

2  similarly situated. A handful of declarations may suffice. <u>See, e.g.</u>, <u>Gilbert v. Citigroup</u>,

3  <u>Inc.</u>, No. 08-0385 SC, 2009 U.S. Dist. LEXIS 18981, 2009 WL 424320, at *2 (N.D. Cal.

4  Feb. 18, 2009) (finding standard met based on declarations from plaintiff and four other

5  individuals); <u>Escobar</u>, 2008 U.S. Dist. LEXIS 68439, 2008 WL 3915715, at *3-4 (finding

6  standard met based on declarations from three plaintiffs); <u>Leuthold</u>, 224 F.R.D. at 468-69

7  (finding standard met based on affidavits from three proposed lead plaintiffs).

8      Furthermore, the "fact that a defendant submits competing declarations will not as

9  a general rule preclude conditional certification." <u>See</u> <u>Harris v. Vector Mktg. Corp.</u>, 716

10  F. Supp. 2d 835, 838 (N.D. Cal. 2010) (citation omitted). Competing declarations simply

11  create a "he-said-she-said situation"; while "[i]t may be true that the [defendant's]

12  evidence will later negate [the plaintiff's] claims, that should not bar conditional

13  certification at the first stage." <u>Escobar</u>, 2008 U.S. Dist. LEXIS 68439, 2008 WL

14  3915715, at *4.

15  **III.**    **DISCUSSION**

16      **A.    Which Standard Applies**

17      As a preliminary matter, the Court faces the threshold question of what standard

18  to apply to Plaintiffs' motion. Plaintiffs argue the Court should apply the more lenient first-

19  step analysis. (Reply at 6-8.) Defendant, on the other hand, argues for a heightened

20  standard because pre-certification discovery has already taken place. (Opp'n at 15-16.)

21  In support, Defendant notes that at the time of filing the opposition, the case had been

22  pending for over a year and the parties had engaged in discovery, including: "(i)

23  depositions of the named Plaintiffs and their declarants regarding their duties, (ii) a Rule

24  30(b)(6) deposition of M-I SWACO on multiple topics including the duties of the

25  California mud engineers, (iii) the exchange of written discovery responses, and (iv) the

26  production of thousands of pages of documents." (Opp'n at 15.)

27      Plaintiffs argue otherwise, contending that "discovery in this suit is far from

28  complete, and therefore the early "notice stage" standard must apply." (Reply at 6.)

Plaintiffs provide the better argument. As Plaintiffs' note, they filed the instant motion on July 8, 2013, less than six months after the initial scheduling conference, held on January 24, 2013, and less than three months after the exchange of initial disclosures on April 24, 2013.

The original hearing date for this conditional collective action motion of August 5, 2013 was continued *sua sponte* by the Court to August 30, 2013. (ECF No. 13.) The parties then entered in to a joint stipulation to continue the hearing date from August 30, 2013 to February 21, 2014. As stated in the stipulation, one reason for the continuance was Defendant's need for "additional time to conduct discovery, including taking the depositions of Plaintiffs and declarants, and to prepare and file opposition papers." (ECF No. 14 at 2.) The parties also agreed to continue dates that were previously set in connection with class certification under Rule of Civil Procedure 23 and, if applicable, moving for collective certification under the FLSA. In other words, two separate collective certification motions, consistent with two-stages of review, were scheduled: one in advance of and one simultaneous with the motion for class certification. (ECF No. 14.)

The Court granted the parties' stipulation on August 5, 2013. (ECF No. 15.) On December 17, 2013, the parties filed a second stipulation to an additional thirty-five day continuance. The Court granted the stipulation on December 18, 2013. (ECF No. 19-20.) The opposition and reply to the conditional collective action motion were filed on February 21, 2104, and March 7, 2014, respectively.

Plaintiffs contend that the procedural history shows that the Court and parties have contemplated two separate stage analyses for Plaintiffs' motion for conditional collective certification. Further, while the parties have engaged in discovery, discovery is not yet complete.

The Court agrees with Plaintiffs' contentions. Although Plaintiffs stipulated to allow the hearing on the collective certification motion to be delayed a significant amount of time, it is without question that Plaintiffs moved the Court early in the litigation to conditionally certify the collective action. The vast majority of the discovery occurred

1    after Plaintiffs filed the instant motion. Plaintiffs also note that Defendant had not

2    disclosed any of the nine drilling fluid specialist declarants prior to the fling of the

3    opposition, thereby not providing Plaintiffs a meaningful opportunity to question those

4    witnesses.

5         The Court holds that although the parties have engaged in some discovery thus

6    far, adopting the first-stage analysis is appropriate at this time because discovery is not

7    yet complete. Courts in this Circuit, including this Court, routinely reject defendants'

8    requests to apply heightened scrutiny before the close of discovery and hold that the

9    first-stage analysis applies until the close of discovery. See, e.g., Kress, 263 F.R.D. at

10   629 ("Courts within this circuit ... refuse to depart from the notice-stage analysis prior to

11   the close of discovery."); see, e.g., Villa, 2012 U.S. Dist. LEXIS 162922, 2012 WL

12   5503550 at * 13 ("In this case, discovery is still ongoing; fact discovery does not close

13   until April 11, 2013. Accordingly, the Court applies the lower, notice-stage standard for

14   conditional certification."); Guifu Li v. A Perfect Fran., Inc., 5:10-CV-01189-LHK, 2011

15   U.S. Dist. LEXIS 114821, 2011 WL 4635198-LHK, *4 (N.D. Cal. Oct. 5, 2011) (holding

16   that although parties had already engaged in "significant discovery," first-stage analysis

17   was appropriate because discovery was still ongoing and "[i]t is likely that the Plaintiffs

18   have not yet presented a complete factual record for the Court to analyze."); Lewis, 669

19   F.Supp.2d at 1127-28 (declining to apply second-stage review even though "volumes of

20   paper have been produced and several witnesses deposed" because to apply a different

21   standard would "be contrary to the broad remedial policies underlying the FLSA").[7]

22        Nor does a preliminary notice sent by Plaintiffs, which invites potential opt-ins to

23   provide information relevant to the case on a voluntary basis, justify application of a

24   heightened standard. See Harris, 716 F. Supp. 2d at 846 (rejecting defendant's

25   _____

26       [7] See also Hill v. R+L Carriers, Inc., 690 F.Supp.2d 1001, 1009 (N.D. Cal. 2010); Wynn, 234
     F.Supp.2d at 1082; Murillo v. Pac. Gas & Elec. Co., 266 F.R.D. 468, 471 (E.D. Cal. Mar. 5, 2010); Romero

27   v. Producers Dairy Foods, Inc., 235 F.R.D. 474, 482 (E.D. Cal. Apr. 19, 2006); Leuthold, 224 F.R.D. at
     467; Labrie, 2009 U.S. Dist. LEXIS 25210, 2009 WL 723599 at *3; Rees v. Souza's Milk Transp., Co., No.

28   CVF0500297, 2006 U.S. Dist. LEXIS 12159, 2006 WL 738987, at *3 (E.D. Cal. Mar. 22, 2006).

1    argument to raise standard even though "Ms. Harris sent out a precertification notice,

2    and thus arguably could or should have gathered information from the persons who

3    received notice.").

4         The rationale behind courts' refusal to skip the notice-stage has been set forth as

5    follows. <u>See</u> <u>Leuthold</u>, 224 F.R.D. at 467-68. Skipping to the second stage not only

6    requires the court to evaluate an incomplete factual record — it interferes with the future

7    completion of that record. <u>Id.</u> Separate from the risk of an incomplete factual record,

8    "[b]ypassing the notice-stage altogether . . . might deprive some plaintiffs of a meaningful

9    opportunity to participate." <u>Id.</u> Measured against these dangers, delaying the second

10   stage analysis risks little harm to defendant, who will be free to move for decertification

11   "once the factual record has been finalized and the time period for opting in has expired."

12   <u>Id.</u>

13        This Court is persuaded by <u>Leuthold</u>'s rationale, and accordingly, finds that the

14   notice-stage standard applies in this case. After discovery is complete, Defendant can

15   move for decertification, and the Court will then apply the heightened second-stage

16   review.

17        **B.    Application of the Notice-Stage Standard to this Case**

18        Plaintiffs must show that the proposed lead plaintiffs and the proposed collective

19   action class members are "similarly situated." <u>Guifu Li</u>, 2011 U.S. Dist. LEXIS 114821,

20   2011 WL 4635198, at *3. Under the notice-stage standard, this requires Plaintiffs to

21   provide "'substantial allegations, supported by declarations or discovery, that 'the

22   putative class members were together the victims of a single decision, policy, or plan.'"

23   <u>Kress</u>, 263 F.R.D. at 629. Where, as here, a case involves a claim of misclassification of

24   FLSA-exempt status, courts also require plaintiffs to "provide some further allegations or

25   evidence indicating that prospective class members share similar job duties." <u>Id.</u> at 629-

26   30.[8] <u>See, e.g.</u>, <u>Lewis</u>, 669 F.Supp.2d at 1128; <u>Trinh v. JP Morgan Chase & Co.</u>, No. 07-

27   _____

28   [8] This is because "[a]s a matter of both sound public policy and basic common sense, the mere classification of a group of employees - even a large or nationwide group-as exempt under the FLSA is not

(continued…)

1   CV-1666, 2008 U.S. Dist. LEXIS 33016, 2008 WL 1860161, at *4 (S.D. Cal. Apr. 22,

2   2008). Here, the Court concludes that the evidence submitted by Plaintiffs is sufficient to

3   establish that the named Plaintiffs and the putative class members are "similarly

4   situated." Below, the Court addresses whether Plaintiffs have shown that the putative

5   class members were victims of a single common policy and then discusses whether they

6   shared similar job duties.

7          First, the Court holds that Plaintiffs have shown that the putative class members

8   were the victims of a single decision, policy, or plan. This requirement is met upon a

9   showing that Plaintiffs were subject to the same uniform classification of exempt status

10  under FLSA. See, e.g., Kress, 263 F.R.D. at 629; Lewis, 669 F.Supp.2d at 1128. Here,

11  the declarations of the drilling fluid specialists provided by Plaintiff confirm that they were

12  paid on a salary basis, and not provided additional pay for overtime, travel time, or

13  missed meal or rest breaks. See Balfour Decl. ¶¶ 26-27; Syed Decl. ¶¶ 14-15; Crane

14  Decl. ¶¶ 24-25; Doherty Decl. ¶¶ 16-17. If the drilling fluid specialists worked additional

15  days they were paid an additional daily rate. See Balfour Decl. ¶ 29; Crane Decl. ¶ 27.

16  Defendants do not contend that the drilling fluid specialists were paid in a different

17  manner. See Stanfield Decl. ¶ 14, Stanfield Depo. 45:16-24.[9] Accordingly, it is concluded

18  that all putative class members are uniformly subjected to the same compensation policy

19  that classifies them as exempt under FLSA.

20

--------------------------------

21  (…continued)
    by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders
22  all putative class member as 'similarly situated' for § 216(b) purposes." Colson v. Avnet, Inc., 687 F. Supp.
    2d 914, 927-28 (D. Ariz. 2010). "If it were, in every instance where an employer is accused of
23  misclassifying a large group of employees, the district court would then somehow be required to order
    collective action notification, irrespective of the quality or quantity of evidence that had been produced in
24  the form of declarations and supporting exhibits." Id.
        [9] Q: Sure. Is your understanding that a DFS is not paid overtime, that they are exempt from
25  overtime pay requirements?
    A. Currently, yes, that is correct.
26  Q. And is it your understanding that that's been the – that has been true since 2008?
    A. Yes.
27  Q. And that's true of all levels of DFS, correct?
    A. Yes.
28  Id. at 45:16-24.

1    Second, the Court considers "whether plaintiffs' evidence indicates that the

2    propriety of the classification may be determined on a collective basis," Kress, 263

3    F.R.D. at 630, i.e., whether Plaintiffs have demonstrated that putative class members

4    have similar job duties. Courts set forth this second requirement in cases alleging

5    misclassification of exempt FLSA status because whether any given employee is entitled

6    to overtime compensation depends on an individual, fact-specific analysis of that

7    employee's job responsibilities under the relevant statutory exemption criteria. Holt v.

8    Rite Aid Corp., 333 F.Supp.2d 1265, 1271 (M.D. Ala. 2004).[10] Therefore, for the purpose

9    of certifying a collective action, the critical question is whether there is sufficient similarity

10   of job duties to allow collective determination of exemption status. Here, the Court finds

11   that Plaintiffs have met the lenient standard of showing that putative class members

12   perform similar job duties, as explained below.

13       Plaintiffs have set forth substantial allegations in their complaint[11] and have

14   submitted evidence in the form of four declarations and documents from Defendants

15   which suggest that putative class members are similarly situated with respect to their job

16   duties. With respect to the similarity between employees within each of the five job titles

17   at issue (e.g., drilling fluid specialist I-IV, and drilling fluid specialist senior), Plaintiffs

18   have submitted evidence that under Defendant's job descriptions, each of the positions

19   _____

20   [10] The dispositive facts are those that define an employee's primary duties. See 29 C.F.R. §
     541.700 ("To qualify for exemption under this part, an employee's 'primary duty' must be the performance

21   of exempt work."). "Determination of an employee's primary duty must be based on all the facts in a
     particular case, with the major emphasis on the character of the employee's job as a whole. Factors to

22   consider when determining the primary duty of an employee include, but are not limited to, the relative
     importance of the exempt duties as compared with other types of duties; the amount of time spent

23   performing exempt work; the employee's relative freedom from direct supervision; and the relationship
     between the employee's salary and the wages paid to other employees for the kind of nonexempt work

24   performed by the employee." 29 C.F.R. § 541.700(a).

25   [11] Plaintiffs allege that all putative class members have "[a]t all relevant times… have been
     similarly situated, have had substantially similar job requirements and pay provisions, and have been

26   subject to Defendants' common practices, policies, programs, procedures, protocols and plans of willfully
     failing and refusing to pay them at the legally required time- and-a-half rates for work in excess of forty

27   (40) hours per workweek, willfully failing to keep records required by the FLSA, and willfully failing and
     refusing to pay them at overtime rates, or at all.." (Compl. ¶ 24.)

28

shared identical functions and responsibilities, including: review mud program to prepare orders and mixing plans; write procedures for mixing mud and handling of products; gather chemical or fluid samples for testing; test fluids to determine trends and identify contaminants; record mud testing results to identify trends; interpret data from mud property checks to evaluate treatment or action required; determine the cause of mud, hole, or system problems so correct treatment can be recommended; determine chemical treatment to optimize drilling parameters; advise clients on potential treatments or improvements to the mud system based on data analysis and mud testing; make recommendations concerning solids control processes to ensure the equipment is optimized for economic solids removal; supervise rig personnel when performing chemical additions and recording drilling fluid parameters; manage product inventory to ensure availability; establish and maintain good working relationships with clients and rig personnel; maintain environmental discharge and consumption records as required by legislation or client; comply with company and customer health and safety procedures; follow daily reporting processes and procedures; monitor daily drilling operations to reduce or eliminate problems associated with drilling mud; and sell and influence clients' decision in buying the optimal M-I Swaco products and systems to maintain the necessary mud properties. (Connor Decl., Exs. 1-5, ECF No. 22-1.) While the job function and responsibilities for each position are similar, the positions entail progressively less supervision, and include the training of lower level drilling fluid specialists. (Id.)

Further, Plaintiffs have submitted declarations in which putative class members testify that other employees with their job title share substantially similar job duties. See, e.g., Balfour Decl. 17 ("I and most of the hundreds of other mud men across the country had the same basic job duties: We would take samples of drilled mud from the mud tanks. The samples would show whether the properties of the drilling fluid, also known as drilling mud, were within specifications designated by Swaco. We would also keep track of inventory. I reported to the "Company Man" who ran the rig and who was

ultimately responsible for my work."); Crane Decl. ¶ 12 (same); Doherty Decl. ¶ 7 (same)). This evidence suffices to show substantial similarity of job duties between employees within each of the five job titles at issue.

Moreover the declarations of drilling fluid specialists provided by Defendant corroborates that they were engaged in similar job functions. See Blanton Decl. . ¶¶ 3, 7 ("My primary responsibility as a DFS is ensuring that the mud stays in good shape and performs the various functions discussed above....  As mentioned above, one of the many things I do to monitor the mud is conduct a "mud check," which is really a series of separate tests, each of which tell you something different about the mud."); Croy Decl. ¶ 2 ("Drilling fluid or 'mud' is essential to drilling operations. As a mud engineer, I am in charge of the drilling fluid system and responsible for ensuring that the mud has the correct properties to optimize the drilling process. I check on the mud's properties various ways – by running specific tests or a 'mud check,' which is a series of tests, talking to other rig personnel, looking at the mud program or drilling program, looking at, smelling, and feeling the mud, looking at a drilling monitor, etc."); Cusick Decl. ¶ 2 ("In my experience, the drilling fluid or "mud" is the number one thing that will make or break a successful well. ... As a result, it is extremely important for me to pay attention to what is happening with the mud. I do this lots of ways – by running mud checks or by running specific tests, by looking at, touching and smelling the mud, by reading the mud program and/or drilling program, and by talking to other people on the rig, including the drillman.") Fullmer Decl. ¶¶ 2, 6 ("As a mud engineer, my primary responsibility was monitoring the drilling fluid throughout the day and then, depending upon what I had observed, formulating a plan for how to tweak the mud to deal with what was happening downhole. ... Based upon what I had learned from the mud check, the cuttings, conversations with other people on the rig, etc., I would determine if there were any problems with the mud, identify trends that required corrective action, and then come up with a plan for tweaking the mud's composition to optimize the drilling process."); Marquez Decl. ¶¶ 2-3 ("My primary responsibility as a mud engineer is making sure that the mud has the right

1  properties to ensure that the well is being drilled optimally. I monitor the mud by going to

2  the rig, analyzing the mud's weight and viscosity, watching the mud come across the

3  shakers, examining the cuttings that are coming out of the hole, and running mud

4  checks. I will talk to other people who work on the rig, like the derrickman and driller.

5  Depending upon what I learn, I'll know whether or not the mud is within the desired

6  specifications for that well. If the mud is not within the desired specifications, then it's my

7  job as a mud engineer to figure out the appropriate treatment plan to get it back in the

8  desired ranges."); Morren Decl. ¶ 3 ("As a mud engineer, I am responsible for monitoring

9  the drilling fluids and making adjustments as necessary in order to optimize the rate of

10  penetration of the drill bit, maintain well stability, and do so as efficiently as possible to

11  save M-I's customers' money. One way to monitor the drilling fluids is by running a "mud

12  check," which allows me to check the mud's properties and see if they are where they

13  should be."); Pinter Decl. ¶ 2 ("As a mud engineer, I am in charge of the drilling fluids

14  system. The drilling fluids, also known as the "mud," are essential to the drilling process

15  and it is my job to make sure the mud does what it is supposed to do.") Price Decl. ¶ 2

16  ("As a mud engineer, I am responsible for the drilling fluids system or "mud" used in

17  drilling operations. It's my job to monitor the drilling fluids and then, depending upon

18  what is happening with the mud, come up with a recipe to get the mud where it needs to

19  be.").

20        The Court concludes that putative class members across all job descriptions are

21  similarly situated with respect to their primary job duties. All the evidence submitted

22  shows that the primary responsibilities of all the putative class members is to monitor,

23  test, and provide recommendations regarding drilling fluids at the drill site. As described,

24  the job functions and responsibilities for each respective level (I, II, III, IV, or Senior) is

25  identical. (See Connor Decl., Exs. 1-5.) Further, the description provided by all

26  declarants of primary responsibility of the positions, i.e., monitoring, testing and

27  recommending guidance with regard to drilling fluid, was substantially similar.

28        The Court acknowledges that there are indeed differences between putative class

members, as noted by Defendant. (See e.g., Opp'n at 1-2 ("Mud engineers monitor and analyze the well's drilling fluids and prepare and recommend 'treatment plans' to the company man in an ever-changing and dynamic environment. They work different rotations, at any of thousands of different sites throughout the country, for hundreds of different company men, operating under unique mud programs, while dealing with countless different geological formations and responding to any number of daily 'unscheduled' events.").) Defendant explains that the duties of mud engineers are complex and constantly changing. (See Balfour Depo. 72:10-23 ("[E]very well is different…. Every formation is different you are drilling through. I mean, every foot is going to be different. Nothing is the same out there.").) Because of the constantly changing conditions, even on a foot-by-foot basis, mud engineers constantly monitor the drilling fluid, and create a specific 'treatment plan' for each well. (Stanfield Decl. ¶ 4, Fullmer Decl. ¶ 10.) Defendant also describes how the relationship with the 'company man,' the person supervising the drilling site, can vary and may influence the role and amount of guidance provided by the mud engineer. (See Balfour Depo. at 94:21-25, 95:23-97-22, 98:16-20, 99:2-11, 99:23-100:13, 103:18-104:7.) Defendants also contend that the named Plaintiffs did not engage in the same job functions as other drilling fluid specialists, such as performing technical analysis, identifying trends in the drilling fluid, supervise rig personnel, or determining the cause of drilling fluid problems and make appropriate treatment plans. (Opp'n at 12.)

Based on the above differences, Defendant argues that the mud engineers are not similarly situated and individualized factual inquires will be required to determine if the mud engineers qualify for the administrative exemption.[12] (Opp'n at 18.)

Despite the factual issues raised by Defendant, they do not change the Court's conclusion, as Plaintiffs need only show that class members' positions are similar, not

---

[12] Under 29 C.F.R. § 541.200(a), and employee qualifies for the administrative exemption if his "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and… [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

1  "identical," to the positions held by other members. See Misra v. Decision One Mortg.

2  Co., 673 F. Supp. 2d 987, 2008 WL 7242774, at *7 (CD. Cal. 2008); Khadera v. ABM

3  Industries Inc., C08-0417 RSM, 2011 U.S. Dist. LEXIS 152138, 2011 WL 7064235, at *3

4  (W.D. Wash. Dec. 1, 2011) ("If one zooms in close enough on anything, differences will

5  abound . . . Plaintiffs' claims need to be considered at a higher level of abstraction.")

6  (citation omitted).

7      Because the notice-stage is not the appropriate time for a court to evaluate the

8  merits of plaintiffs' FLSA claims, see Morton, 2007 U.S. Dist. LEXIS 31755, 2007 WL

9  1113999, at *3, courts routinely hold that "the potential applicability of an FLSA

10  exemption does not preclude conditional certification." Barrera v. U.S. Airways Group,

11  Inc., CV-2012-02278-PHX, 2013 U.S. Dist. LEXIS 124624, 2013 WL 4654567, at *5 (D.

12  Ariz. Aug. 30, 2013) (collecting cases); Stanfield, 2006 U.S. Dist. LEXIS 98267, 2006 WL

13  3190527, at *4 (rejecting defendant's argument that "the presence of several exemptions

14  that may apply to the putative class members [] precludes class certification" because

15  such a question went to the merits, and noting that "[e]ven if it turns out that [p]laintiffs

16  cannot prevail on their FLSA claim because they are subject to exemptions, a collective

17  action should still be certified if they are similarly situated."); Sliger v. Prospect Mortg.,

18  LLC, CIV. S-11-465 LKK, 2011 U.S. Dist. LEXIS 94648, 2011 WL 3747947, at *3 (E.D.

19  Cal. Aug. 24, 2011) (holding that defendant's evidence that plaintiffs are exempt

20  employees was "beside the point at this [notice]-stage of the proceeding. Defendant will

21  have an opportunity to demonstrate the merits of its affirmative defenses at the second

22  tier stage of this proceeding.").

23      Second, Defendant relatedly argues that the inquiry whether each putative class

24  member is misclassified as exempt will be dominated by individualized factual inquiries.

25  (Opp'n at 18-20.) The Court rejects Defendant's argument, as one which courts have

26  consistently rejected in misclassification cases. See, e.g., Luque v. AT&T Corp., C 09-

27  05885 CRB, 2010 U.S. Dist. LEXIS 126545, 2010 WL 4807088, at *5 (N.D. Cal. Nov. 19,

28  2010) (rejecting defendant's argument that conditional certification should be denied

1    because a fact-intensive inquiry will be required to determine each class member's

2    exemption status, reasoning that courts should not consider the need for individualized

3    inquiries until the second stage of certification); Labrie, 2009 U.S. Dist. LEXIS 25210,

4    2009 WL 723599, at *6 (finding that defendant's "arguments [that individualized inquiries

5    will be needed to determine exempt status] raise issues primarily going to the merits and

6    are more appropriately addressed on a motion to decertify"); Harris, 716 F.Supp.2d at

7    841-842 (collecting cases holding that courts should address the need for individualized

8    inquiries at the second stage of certification); Phillip Flores v. Velocity Express, Inc., No.

9    12-cv-05790-JST, 2013 U.S. Dist. LEXIS 77821, 2013 WL 2468362, at *7 (N.D. Cal.

10    June 3, 2013) (holding that defendant's argument that misclassification of workers would

11    involve a fact-intensive inquiry would not preclude conditional certification). At this stage,

12    the only issue before the Court is whether to conditionally certify the class such that

13    notices may be distributed to potential members of that class. This Court will

14    undoubtedly revisit Defendant's argument and the issue of whether Plaintiffs are actually

15    similarly situated at the second stage, after the parties are provided adequate time to

16    conduct relevant discovery.[13]

17        Finally, Defendant argues that the putative class members are not similarly

18    situated to each other, let alone other mud engineers. (Opp'n at 21-29.) Named Plaintiff

19    Syed never finished attending training and admitted that he did not actually work as a

20    drilling fluid specialist. (Syed Depo. 150:19-22.) Further, named Plaintiff Balfour

21    explained that he did not make decisions, but just followed the mud program where,

22

23

24

25

26

27

28

---

[13] In any event, the Court notes that given that Defendant considered all mud engineers as exempt, likely because Defendants found all mud engineers qualified for exemption, it is difficult for defendant to credibly argue that the need for individual inquiries into exempt status precludes certification. See Delgado, 2007 U.S. Dist. LEXIS 74731, 2007 WL 2847238, at *2 ("It is somewhat disingenuous, then, for Defendants to argue that they should be permitted to treat all sales representatives as one group for purposes of classifying them as exempt, but that this Court can only determine the validity of that classification by looking to the specific job duties of each individual sales representative."); Wang v. Chinese Daily News, Inc., 231 F.R.D. 602, 613 (C.D. Cal. Jan. 20, 2005), reversed in part on other grounds by Wang v. Chinese Daily News, Inc., 709 F.3d 829 (9th Cir. 2013) ("Defendant cannot, on the one hand, argue that all reporters and account executives are exempt from overtime wages and, on the other hand, argue that the Court must inquire into the job duties of each reporter and account executive in order to determine whether that individual is 'exempt.'").

1   Plaintiffs' declarant Doherty explained that he used his judgment when the mud program

2   did not address the situation. (Opp'n at 22-23.)   Declarant Doherty also worked for

3   Defendant for part of the relevant time period as a consultant, not a drilling fluid

4   specialist. (See Doherty Depo. 47:9-49:6.) Defendant also argues that every job site is

5   different, every company man is different, every mud engineer's experience and ability

6   are different, and that mud engineers work varying schedules. (Opp'n at 23-28.)

7        The differences described by Defendant do not persuade the court that

8   conditional certification is improper. First, Defendant's declarations simply create "a he-

9   said-she-said situation" that does not justify denying certification. Escobar, 2008 U.S.

10  Dist. LEXIS 68439, 2008 WL 3915715, at *4. While "[i]t may be true that the

11  [defendant's] evidence will later negate [the plaintiff's] claims, that should not bar

12  conditional certification at the first stage." Id. For example, while Defendant cites to some

13  declarations which suggest that some putative class members work more independently

14  and without supervision, (Opp'n at 27-28) each putative class member only advises the

15  company man regarding issues relating to the drilling fluid. (Opp'n at 6; Stanfield Decl. at

16  ¶ 7; Fullmer Decl. at ¶ 7; Croy Decl. at ¶ 4.) With regard to plaintiff Syed, should, upon

17  further discovery, Plaintiffs determine that due to his short employment history with

18  Defendant he is not a similarly situated to the putative plaintiffs, then Plaintiffs have the

19  option of dismissing him from the complaint or persuading the Court that he is similarly

20  situated.

21       To the extent Defendant's competing declarations suggest there are large

22  differences in job duties between putative class members, the Court notes that "the

23  question at this stage is not whose evidence regarding commonality is more believable,

24  but simply whether plaintiffs have made an adequate threshold showing" that there are

25  substantially similar putative class members. Flores, 2013 U.S. Dist. LEXIS 77821, 2013

26  WL 2468362, at *7. Plaintiffs have made an adequate showing here, and the Court will

27  closely consider "the disparate factual and employment settings of the individual

28  plaintiffs" if and when Defendant makes a motion to decertify, as that fact-specific

1  analysis is appropriate for the second-stage. Id.; see also Camp, 2002 U.S. Dist. LEXIS

2  21903, 2002 WL 31496661, at *4 (holding that "the existence of some variations

3  between potential claimants is not determinative of lack of similarity at the notice-stage.")

4  (emphasis omitted).[14]

5      For the foregoing reasons, the Court concludes Plaintiffs have met the lenient

6  notice-stage standard for conditional certification. If, after the close of discovery, it

7  becomes apparent that Plaintiffs' overtime claims should be pursued on an individual

8  basis, Defendant may move to decertify the class. If applicable, the Court may also then

9  consider the division of the class into subclasses. Schemkes v. Presidential Limousine,

10 No. 2:09-cv-1100-GMN-PAL, 2011 U.S. Dist. LEXIS 34050, 2011 WL 868182, at *3 (D.

11 Nev. March 10, 2011) (holding that courts have, in FLSA cases, "discretion to create

12 subclasses to prevent confusion of the issues and facts to the jury."). Accordingly, the

13 Court recommends that Plaintiffs' motion for conditional certification of a collective action

14 under FLSA be granted.

15     **C.    Plaintiffs' Proposed Class Notice**

16     The Supreme Court has held that employees need to receive "accurate and

17 timely notice concerning the pendency of the collective action, so that they can make

18 informed decisions about whether to participate" in the collective action. Hoffmann-La

19 Roche, 493 U.S. at 170. Here, Plaintiffs have provided a copy of their proposed Notice

20 and opt-in form. (ECF No. 12-2 (notice); ECF No. 12-3 (consent form).) Defendant

21 presents no arguments in opposition to the opt-in form, but argues that the Court "should

22 order the parties to meet and confer concerning the content of the notice and process for

23 its distribution. (Opp'n at 29.) While Plaintiffs have expressed "willing[ness] to meet and

---

24      [14] This rule applies in non-misclassification cases as well. See, e.g., Villa, 2012 U.S. Dist. LEXIS
25 162922, 2012 WL 5503550, *14 (rejecting defendant's argument that "the employment settings and factual
   background of each plaintiff are different" because "those considerations are properly reserved for after
26 completion of discovery when Defendant can bring a formal motion to decertify."); Smith v. Bimbo Bakeries
   USA, Inc., CV 12-1689-CAS JWX, 2013 U.S. Dist. LEXIS 118178, 2013 WL 4479294, at *4 (C.D. Cal.
27 Aug. 19, 2013) (holding that "the Court need not resolve these factual disputes [regarding differences in
   plaintiffs' job duties] at this time" because "[a] detailed analysis of such issues as differing job functions is
28 more properly made" at the second step of the certification process.") (citation omitted).

confer," (Reply at 18), the Court has reviewed the Plaintiffs' proposed notice and finds such a meet and confer process unnecessary, provided the proposed notice is amended as follows:

1) The Plaintiffs have, on the third page and in the penultimate sentence of the notice, stated that the notice has not been prepared by the Court, and is not a representation by the Court of the merits of the lawsuit. (ECF No. 12-2.) While this language should remain on page three of the notice, the statement should also appear in bold at the top of the front page below the second sentence ("This is a Notice of a Collective Action...") so that the Court's neutrality is made explicit to potential plaintiffs. See Adams, 242 F.R.D. at 540 (ordering a precisely similar change to a notice); Hoffmann-La Roche, 493 U.S. at 174 ("[T]rial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action when overseeing the notice-giving process").

2) On page 1, in the table titled "Your Current Legal Rights and Options in this Lawsuit," it states that the recipient can submit a consent to join form to "Participate in this lawsuit" and "Receive a payment." The sentence "Receive a payment" should be removed as it implies that all who join the class will receive a payment.

3) In section 4 of the notice ("Notification of Your Right to Join the Lawsuit."), the language "with the Court" should be removed from the fourth, fifth and sixth sentences.  Notices, consents and the like are not to be mailed to the Court.

## IV.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons and subject to the immediately preceding section relating to the proposed notice, the Court RECOMMENDS Plaintiffs' motion for conditional FLSA collective action certification be GRANTED. The Court recommends that the following class be conditionally CERTIFIED:

All persons who were, are, or will be employed by Defendant, on or after the date that is three years before the issuance of an Order authorizing Notice (the "FLSA Class Period"), in the job position known as drilling

22

fluids specialist ("DFS"), "mud engineer," "mud man," "mud man trainee," or "consultant mud man," or equivalent titles (the "FLSA Collective Plaintiffs").

Further, the Court recommends that within fourteen days of the date of the adoption of these recommendations, Defendant release to Plaintiffs in Microsoft excel or comparable form, a class list to Plaintiffs' counsel, including, to the extent known by Defendant, the names, last known mailing addresses, telephone numbers, and email addresses of present and former employees falling within the above class description.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   July 30, 2014                    /s/ Michael J. Seng
                                          UNITED STATES MAGISTRATE JUDGE

23