1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SARMAD SYED and ASHLEY              No.  1:12-cv-01718-DAD-MJS
     BALFOUR, individually, and behalf of all
12   others similarly situated,

13                      Plaintiffs,        ORDER GRANTING FINAL APPROVAL OF
                                           CLASS SETTLEMENT
14           v.
                                           (Doc. No. 87)
15   M-I, L.L.C., a Delaware Limited Liability
     Company, doing business as M-I SWACO;
16   and DOES 1 through 10, inclusive,

17                      Defendant.

18

19

20          On June 8, 2017, plaintiffs filed a motion for order granting final approval of class

21   settlement.  (Doc. No. 87.)  The motion is unopposed and came before the court for hearing on

22   July 6, 2017.  Attorneys James Hill and Diana Khoury appeared telephonically on behalf of

23   plaintiffs.  Attorneys Jason Mills and Joseph Mara appeared on behalf of defendant.  Oral

24   argument was heard and the motion was taken under submission.  (*Id.*)  For the reasons discussed

25   below, the court will grant the plaintiff's motion.

26                                      **BACKGROUND**

27          This court previously granted preliminary approval of a class action settlement in this

28   action on February 22, 2017.  (Doc. No. 84.)  Pertinent factual details as well as plaintiffs'

                                               1

1   allegations may be found in that order.  Following the granting of preliminary approval, class

2   notices were mailed to the class.  Although defendant, M-I SWACO, was unable to provide

3   addresses for an estimated 24 members of the California Class, class counsel was able to locate

4   those 24 individuals in addition to 7 other class members whose notices were returned as

5   undeliverable.[1]  (Doc. No. 87-1 at 17, n.1.)  Thus far, not a single member has filed an objection

6   to the settlement and only one member of the California Class has requested exclusion.  (Doc.

7   Nos. 87-2 at 4, ¶¶ 12, 14; 87-3 at 11, ¶ 42.)  The class currently consists of 467 individuals, which

8   includes 117 participating FLSA Class Members and 350 California Class Members.  (Doc. No.

9   87-2 at 5, ¶¶  15, 18, 19.)

## FINAL CERTIFICATION OF CLASS ACTION

11          The court conducted an examination of the class action factors during its preliminary

12   approval of the settlement, and found certification warranted.  (*See* Doc. No. 84 at 6–12.)  Since

13   no other issues concerning whether certification is warranted have been raised, the court will not

14   repeat its prior analysis here, but instead reaffirms it and finds final certification appropriate.  The

15   following classes are certified:

16          California Class:

17          The "California Rule 23 Class Member(s)" or "California Class"
            means all persons employed by Defendant in California in a
18          Covered Position at any time during the period from October 18,
            2008 through November 30, 2016.  There are an estimated 353
19          members in this group, which includes current and former
            employees who performed work for Defendant solely in California,
20          as well as employees who performed work for Defendant both in
            California as well as outside of California.
21
22          "Covered Position" means a drilling fluid specialist, mud engineer,
            mud man trainee, or consultant mud man, or equivalent title, as
23          enumerated in Appendix No. 1 to this Agreement.

            FLSA Collective Class Action Class:
24
25          "FLSA Collective Action Class" means the 115 individuals
            employed by Defendant in a Covered Position during the period
26          from August 5, 2010 through November 30, 2016, who previously

27   _____
     [1] At oral argument on the pending motion, the parties also represented that three class members
     have not been located although information has been sent to each of the three, and that one of
28   those three has a claim for only $100, which might not be pursued.

consented to join the Federal Labor Standards Act Collective Action, pursuant to Section 16(b), 29 U.S.C. § 216(b), ("FLSA") and who have not performed work for Defendant in California during that time period.

(Doc. Nos. 76-2 at 88; 80 at 3.)

In addition and for the reasons stated in the order granting preliminary approval, plaintiffs Sarmad Sayed and Ashley Balfour are confirmed as class representatives, while the law firms of Spiro Law Corp., Blanchard Law Group, APC, the Holmes Law Group, APC and Cohelan, Khoury, & Singer are confirmed as class counsel.  Finally, CPT Group, Inc. is confirmed as the settlement administrator.

## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

A class action may be settled only with the court's approval.  Fed. R. Civ. P. 23(e). "Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).  At the final approval stage, the primary inquiry is whether the proposed settlement "is fundamentally fair, adequate, and reasonable." *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness."  *Hanlon*, 150 F.3d at 1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982)); *see also Lane*, 696 F.3d at 818–19.  Having already completed a preliminary examination of the agreement, the court reviews it again, mindful that the law favors the compromise and settlement of class action suits.  *See, e.g., In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *Churchill Village, LLC. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice*, 688 F.2d at 625 (9th Cir. 1982).  Ultimately, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he [or she] is exposed to the litigants and their strategies, positions, and proof."  *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003) (quoting *Hanlon*,

3

1    150 F.3d at 1026).

> Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026 (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)); *see also Lane*, 696 F.3d at 819 (referring to the listed factors as the "*Hanlon* factors"). "To survive appellate review, the district court must show it has explored comprehensively all factors[.]" *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)); *see also Hanlon*, 150 F.3d at 1026. Below, the court will consider each of these factors in relation to this proposed class settlement.

### 1.    Strength of Plaintiff's Case

When assessing the strength of plaintiff's case in this context, the court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989). The court cannot reach such a conclusion, because evidence has not been fully presented. *Id*. Instead, the court is to "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Id*.

While plaintiffs believe in the merits of their claims, they also recognize that defendant M-I SWACO, "has strong defenses to liability and objections to plaintiffs' ability to obtain certification of the California Class." (Doc. No. 87-3 at 13, ¶ 49.) Defendant had argued that the claims were inappropriate for class certification because of the variation in work duties and demands of the oil company clients with whom the class members had worked, which in turn determined in large part how much or how little break or sleep time each class member was allotted. (Doc. No. 87-1 at 25.) In addition, while testing was generally automated, variation in geography also affected the amount of testing performed and posed a risk to certification of the

4

class.  (*Id.* at 26.)  Plaintiffs acknowledge that there was also some evidence that pairs of Mud Men would be used where the senior employee was both the trainer and mentor to less experienced Mud Men, which meant that sometimes only the less-experienced employees were able to take breaks and sleep time.  (Doc. No. 87-3 at 13, ¶ 50.)  Plaintiff notes that defendant also contended that plaintiffs would have faced additional obstacles obtaining class certification, especially in light of the Supreme Court's decisions in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  (Doc. No. 87-1 at 26.)[2] Therefore, it is clear that plaintiffs' case, despite its strengths, was seriously contested by defendants in this litigation.  Consideration of this factor therefore weighs in favor of the court concluding this settlement should be approved.

  2. <u>Risk, Expense, Complexity, and Likely Duration of Further Litigation, and Risk of Maintaining Class Action Status Through Trial</u>

  Employment law class actions are, by their nature, time-consuming and expensive to litigate.  *Hightower v. JPMorgan Chase Bank, N.A.*, No. CV 11-1802 PSG (PLAx), 2015 WL 9664959, at *6 (C.D. Cal. Aug. 4, 2015).  Here, the claims involved complex and disputed issues of law and fact.  (*Id.* at 25.)  Plaintiffs' counsel recognize that in foregoing settlement and litigating the action, they risked the denial of Rule 23 certification and an unfavorable result on summary judgment, trial, or appeal.  (*Id.*)  This risk is especially significant given that plaintiffs' counsel undertook the case on a contingency fee basis with no guarantee for compensation despite the substantial costs, fees, and time invested in pursuing this action.  (*Id.* at 27.)  Additionally, plaintiffs' counsel notes that despite the existence of records retracing work time, reassembling the amount of overtime recovery would have required significant expert preparation and analysis at significant expense.  (*Id.* at 26.)

/////

/////

---

[2]  In this regard, plaintiff notes that in *Comcast* the Supreme Court overturned class certification because the damages model "[fell] short of establishing that damages are capable of measurement on a classwide basis."  *Comcast*, 133 S. Ct. at 1433.

3.     The Amount Offered in Settlement

The gross settlement amount in this case is $7,000,000, which includes attorneys' fees amounting to $2,333,333 as well as class counsels' litigation costs in the amount of $49,857.37. (Doc. No. 87-1 at 15.)  As the court previously determined, this figure represents 35 percent of the total involved in the major class overtime claims.  (Doc. No. 84 at 15.)  The gross settlement amount also includes class representative service payments of $15,000 to plaintiff Balfour and $20,000 to plaintiff Sarmad Syed, as well as administrative expenses in $11,500, and a PAGA payment to the Labor Workforce and Development Agency ("LWDA") of $75,000.  (Doc. No. 87-1 at 15–16.)  The net settlement amount is valued at $4,282,532.61, less employer-side payroll taxes estimated at $212,776.69 to be distributed among 467 class members.  (*Id.* at 16)  This amount is non-reversionary and shall be distributed proportionately based on the number of weeks worked by each individual during the relevant class period in relation to the number of weeks worked by all class members during the class period.  (*Id.* at 16, 20)  The 117 members of the FLSA Class have worked a total of 15,735.01 weeks during the relevant class period and the 350 members of the California class have worked a total of 47,370.23 actual weeks.  (*Id.* at 16.)  Upon final approval, the settlement will result in payment of $81.39 for each week worked by California Class Members, thus paying those class members on average $11,016.07 with the highest payment of $34,475.81.  (*Id.* at 20.)  For FLSA Class Members, the settlement will result in payment of $27.13 for each week worked, with the average payment to FLSA class members of $3,648.79 and the highest payment amounting to $8,949.21.  (*Id.*)  The class has overwhelmingly embraced and approved the settlement amount.  (*Id.*)

As found in the court's prior order granting preliminary approval, this settlement amount is fair and reasonable in relation to the potential recovery and the court's analysis of that issue remains unchanged.  The amount offered in the settlement supports final approval of the settlement .

4.     Extent of Discovery Completed and the Stage of the Proceedings

Discovery in this action commenced on July 15, 2013, with plaintiffs serving interrogatories, requests for production of documents, and noticing defendant's FRCP 30(b)(6)

deposition which was held on January 6, 2014.  (*Id.* at 14.)  Defendant served its responses to all discovery on October 7, 2013.  (*Id.*)  Defendants took depositions of the named class representatives, Ashley Balfour and Sarmad Syed on January 7 and 8, 2014.  (*Id.*)  Defendants also took the depositions of the FLSA Class Members, Alan Crane and Adam Doherty on February 18 and 19, 2014.  (*Id.*)  After the FLSA Collective Action Class was certified and pursuant to the court's March 11, 2015 order, the third party administrator mailed the notice of collective action and consent to join form to 1,435 prospective class members.  (*Id.*)  As a result, by June 9, 2015, 168 individuals submitted forms agreeing to join the FLSA Collective Action Class.  (*Id.*)  Plaintiffs requested a second set of document production on April 16, 2014.  (*Id.*)  Defendant responded to this request by June 6, 2014.  (*Id.*)  Throughout the course of discovery, approximately 4,244 documents have been exchanged by the parties with 2,864 pages of discovery produced by defendants and 1,380 pages of discovery produced by plaintiffs.  These documents include personnel files, job descriptions, guidelines, company handbooks, policies, training manuals, redacted drilling reports, e-mails, and other relevant documents.  (*Id.*)  Plaintiffs' counsel also informally interviewed over 80 class members and obtained 17 declarations to accompany their Rule 23 class certification motion.  (*Id.*)  Defendant deposed four of those declarants in preparing its opposition to class certification.  Defendant also produced an excel file containing over 7,700 lines of data reflecting class member salary and workweek information.  (*Id.* at 15.)  This information was gathered through informal class member interviews, declarations, and depositions.  (*Id.*)  This excel sheet allowed plaintiff's professional consultant to calculate class-wide damages, which were later used at mediation.  (*Id.*)  Ultimately, the parties mediated before Jeffrey Krivis in Encino, California on September 1, 2016 and engaged in serious and informed arm's-length negotiations.  (*Id.*)  Both sides were represented by counsel and were able to reach an agreed settlement by the day's end.  (*Id.*)  All of this litigation conduct supports the conclusion that this settlement is "not the product of fraud or overreaching by, or collusion among, the negotiating parties."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992) (quoting *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 997 (9th Cir. 1985)); *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

5.     Experience and Views of Counsel

Class counsel believes that this settlement is in the best interest of the class based on their knowledge of the issues presented and the risks inherent in a lengthy trial of this action that could affect the value of the claims.  (*Id.* at 20.)  Class counsel notes that the affirmative defenses raised by defendant, the uncertainty of Rule 23 certification, and the prospect of an adverse ruling on summary judgment were carefully considered in arriving at this settlement.  (*Id.* at 20–21.) Counsel also finds that the settlement provides an excellent recovery for class members and that the court should therefore find the settlement to be fair, adequate, and reasonable.  (*Id.* at 21.) Class counsel's experience supports such a finding by the court given that they focus on litigation, represent employees in consumer wage and hour class actions, and have been appointed as class counsel or co-counsel in over 225 cases.  (*Id.* at 30.)  The court accepts plaintiffs' counsel's declaration, consideration of which fully supports the conclusion that the settlement should be approved.

6.     Presence of a Governmental Participant

The settlement agreement contemplates payment of $75,000, or 75 percent of $100,000, to California's Labor and Workforce Development Agency ("LWDA") under the Private Attorneys General Act ("PAGA").  (Doc. No. 87-1 at 16.)  This too weighs in favor of approval of the settlement.  *See Adoma v. Univ. of Phoenix Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012); *Zamora v. Ryder Integrated Logistics, Inc.*, No. 13-cv-2679-CAB (BGS), 2014 WL 9872803, at *10 (S.D. Cal. Dec. 23, 2014) (factoring civil PAGA penalties in favor of settlement approval).

7.     Reaction of the Class to Proposed Settlement

The absence of objections to a proposed class action settlement supports the conclusion that the settlement is fair, reasonable, and adequate.  *See National Rural Telecomms. Coop.*, 221 F.R.D. at 529 ("The absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement.") (citing cases); *Barcia v. Contain-A-Way, Inc.*, 3:07-cv-00938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal. 2009).  According to the declarations of Tim Cunningham on behalf of CPT Group, Inc. and Attorney Isam C. Khoury, while only one member of the California Class has requested exclusion, no member of either

1   class has filed an objection to the settlement before the court.  (Doc. Nos. 87-2 at 4, ¶¶ 12, 14; 87-3

2   at 11, ¶ 42.)  As noted, the class has overwhelmingly approved the settlement amount.  (Doc. No.

3   87-1 at 20.)  Accordingly, consideration of this factor weighs significantly in favor of granting

4   final approval and the court approves the settlement as fair, reasonable, and adequate.

5                                    **ATTORNEYS' FEES AND COSTS**

6                Within their motion for an order granting final approval of class settlement, class counsel

7   also requests that the court approve the requested attorneys' fees and expenses.  Class counsel

8   also requests approval of incentive payments for the named class representatives, and approval of

9   payments to the settlement administrator.  (Doc. No. 87-1 at 33–34.)  For the reasons discussed

10  below, the court approves of and will order these payments.

11       1.       The Requested Attorneys' Fees are Reasonable

12               This court has an "independent obligation to ensure that the award [of attorneys' fees],

13  like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In*

14  *re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011).  This is because,

15  when fees are to be paid from a common fund, the relationship between the class members and

16  class counsel "turns adversarial." *In re Mercury Interactive Corp. v. Securities Litigation*, 618

17  F.3d 988, 994 (9th Cir. 2010); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d

18  1291, 1302 (9th Cir. 1994).  As such, the district court assumes a fiduciary role for the class

19  members in evaluating a request for an award of attorneys' fees from the common fund.  *Id.*; *see*

20  *also Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012); *Rodriguez v. West Publ'g Corp.*, 563

21  F.3d 948, 968 (9th Cir. 2009).

22               Because this case is premised on federal question jurisdiction (Doc. No. 1 at 1), federal

23  law governs the award of attorneys' fees.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047

24  (9th Cir. 2002) ("Because Washington law governed the claim, it also governs the award of

25  fees."); *see also* 10 Fern M. Smith, *Moore's Federal Practice* Civil § 54.171 (2015) ("In cases

26  within the district courts' federal-question jurisdiction, state fee-shifting statutes generally are

27  inapplicable.")  "Under Ninth Circuit law, the district court has discretion in common fund cases

28  to choose either the percentage-of-the-fund or the lodestar method" for awarding attorneys' fees.

1    *Vizcaino*, 290 F.3d at 1047.  The Ninth Circuit has generally set a 25 percent benchmark for the

2    award of attorneys' fees in common fund cases.  *Id.* at 1047–48; *see also In re Bluetooth*, 654

3    F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee

4    award, providing adequate explanation in the record of any 'special circumstances' justifying a

5    departure.").  Reasons to vary the benchmark award may be found when counsel achieves

6    exceptional results for the class, undertakes "extremely risky" litigation, generates benefits for the

7    class beyond simply the cash settlement fund, or handles the case on a contingency basis.

8    *Vizcaino*, 290 F.3d at 1048–50; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934,

9    954–55 (9th Cir. 2015).  Ultimately, however, "[s]election of the benchmark or any other rate

10   must be supported by findings that take into account all of the circumstances of the case."

11   *Vizcaino*, 290 F.3d at 1048.  The Ninth Circuit has approved the use of lodestar cross-checks as a

12   way of determining the reasonableness of a particular percentage recovery of a common fund.  *Id.*

13   at 1050 ("Where such investment is minimal, as in the case of an early settlement, the lodestar

14   calculation may convince a court that a lower percentage is reasonable.  Similarly, the lodestar

15   calculation can be helpful in suggesting a higher percentage when litigation has been

16   protracted."); *see also In re Online DVD-Rental*, 779 F.3d at 955.

17          Here, counsel requests an award of one-third or 33 ⅓ percent of the common fund in

18   attorneys' fees equaling $2,333,333.33 of the gross settlement amount.  (*Id.* at 21.)  This

19   attorneys' fees request is supported by the record before the court.  Class counsel has spent a total

20   of 1,561.4 hours of attorney and para-professional time on this case.  (Doc. No. 87-3 at 16, ¶ 59.)

21   Specifically, the attorneys at Cohelan Khoury & Singer expended a total of 850.9 hours.  (*Id.* at

22   20.)  The attorneys at Spiro Law Group spent a total of 299.7 hours.  (*Id.*)  The attorneys at

23   Holmes Law Group devoted a total of 203.7 hours to the litigation, (*id.* at 21) and the attorneys at

24   Blanchard Law group expended a total of 192.1 hours.  (*Id.*)  Additionally, as noted above, the

25   parties have exchanged 4,244 documents during the course of discovery with 2,864 documents

26   being produced by defendants and 1,380 produced by plaintiffs.  As noted, these documents

27   include personnel files, job descriptions, guidelines, company handbooks, policies, training

28   manuals, redacted drilling reports, e-mails, as well as other relevant documents.  (Doc. No. 87-1

at 14.)  The evidence before the court reflects a significant investment of time and effort by counsel in obtaining this settlement.  Counsel's efforts here on behalf of the class resulted in a class recovery of more than $4 million, which is certainly substantial for the hundreds of class members they represented.  (*Id.* at 16.)  These considerations support an above benchmark attorney fee award in this case.

Given the general support in the record for the requested fee award, the court next turns to the lodestar calculation in order to cross-check the requested attorneys' fee award's reasonableness.  Where a lodestar is merely being used as a cross-check, the court "may use a 'rough calculation of the lodestar.'"  *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-1662 OWW MJS, 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149 MMM (SHx), 2008 WL 8150856 (C.D. Cal. July 21, 2008)).  Beyond simply the multiplication of a reasonable hourly rate by the number of hours worked, a lodestar multiplier is typically applied.  "Multipliers in the 3–4 range are common in lodestar awards for lengthy and complex class action litigation."  *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988)); *see also* 4 NEWBERG ON CLASS ACTIONS § 14.7 (courts typically approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is comparable to multipliers used by the courts"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.") (quoting NEWBERG).

For purposes of calculating the lodestar amount, this court has previously accepted as reasonable hourly rates of between $370 and $495 for associates, and $545 and $695 for senior counsel and partners.  *See Emmons v. Quest Diagnostics Clinical Labs., Inc.*, 1:13-cv-00474-DAD-BAM, at *8 (E.D. Cal. Feb. 27, 2017).  Some judges in the Fresno division of the Eastern District of California have approved similar rates in various class action settings, while others have approved lower rates.  *See Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 452 (E.D. Cal. 2013) (awarding between $280 and $560 per hour for attorneys with two to eight years of

1  experience, and $720 per hour for attorney with 21 years of experience); *Gong-Chun v. Aetna*

2  *Inc.*, No. 1:09-cv-01995-SKO, 2012 WL 2872788, at *23 (E.D. Cal. July 12, 2012) (awarding

3  between $300 and $420 per hour for associates, and between $490 and $695 per hour for senior

4  counsel and partners). *But see In re Taco Bell Wage and Hour Actions*, 222 F. Supp. 3d 813,

5  839-40 (E.D. Cal. 2016) (concluding that Fresno division rates are $350 to $400 per hour for

6  attorneys with twenty or more years of experience, $250 to $350 per hour for attorneys with less

7  than fifteen years of experience, and $125 to $200 per hour for attorneys with less than two years

8  of experience); *Reyes v. CVS Pharm., Inc.*, No. 1:14-cv-00964-MJS, 2016 WL 3549260, at *12–

9  13 (E.D. Cal. June 29, 2016) (awarding between $250 and $380 for attorneys with more than

10  twenty years of experience, and between $175 and $300 for attorneys with less than ten years'

11  experience); *Rosales v. El Rancho Farms*, No. 1:09-cv-00707-AWI, 2015 WL 4460635, at *25

12  (E.D. Cal. July 21, 2015) (awarding between $175 and $300 per hour for attorneys with less than

13  ten years of experience and $380 per hour for attorneys with more than twenty years' experience);

14  *Schiller v. David's Bridal, Inc.*, No. 1:10-cv-00616-AWI-SKO, 2012 WL 2117001, at *22 (E.D.

15  Cal. June 11, 2012) (awarding between $264 and $336 per hour for associates, and $416 and $556

16  per hour for senior counsel and partners).  Since these hourly rates are only for the purposes of

17  generally cross-checking the reasonableness of the sought after award of one-third of the common

18  fund as attorneys' fees, the court finds that the rates requested by plaintiffs' counsel here are

19  sufficient for this purpose and will employ those rates in calculating the lodestar.

20  　　Additionally, counsels' declarations are sufficient to establish the number of attorney

21  hours expended on this litigation.  *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264

22  (N.D. Cal. 2015) ("[I]t is well established that '[t]he lodestar cross-check calculation need entail

23  neither mathematical precision nor bean counting . . . [courts] may rely on summaries submitted

24  by the attorneys and need not review actual billing records.'") (quoting *Covillo v. Specialtys Café*,

25  No. C-11-00594 DMR, 2014 WL 954516 (N.D. Cal. Mar. 6, 2014)).

26  　　Here, attorney Jeff Holmes declares that he spent a total of 203.7 hours at an hourly rate of

27  $825, amounting to a lodestar fee of $168,052.  (Doc. No. 87-6, 3–4, ¶ 8.)  He arrived at this

28  number using the Laffey Matrix for attorney billing rates in major U.S. cities.  (*Id.* at 4, ¶ 9.)  Mr.

1    Holmes has been practicing law for 36 years and has been working on this case since 2012. (*Id.*

2    at 3, ¶¶ 2–5.) Attorney Lonnie Blanchard spent a total of 192.1 hours at an hourly rate of $826,

3    for a lodestar fee of $158,674.60. (Doc. No. 87-5 at 3, ¶ 3.) He too arrived at this number using

4    the Laffey Matrix. (*Id.* at ¶ 2.) Attorney Blanchard has been practicing law for 37 years. (*Id.*)

5    Attorney Ira Spiro devoted a total of 95.7 hours to this matter at $825 per hour for a total lodestar

6    fee of $78,952.50. (Doc. No. 87-4 at 3, ¶ 3.) Attorney Jennifer L. Connor spent a total of 143.0

7    hours at $440 per hour for a total lodestar fee of $78,952.50. (*Id.*) Attorney Spiro arrived at these

8    numbers for himself and Ms. Connor using rates that were approved in early 2017 by the San

9    Bernardino Superior Court in a wage and hour class action, *Pimpton v. Gordin Trucking*, Case

10   No. CIV-DS-1511918. (*Id.*) Attorney Scott Leviant expended a total of 61 hours at $575 per

11   hour for a total lodestar fee of $35,075.00. (*Id.*) Although these rates are on the higher end of the

12   spectrum, this court notes that it has approved comparable rates in similar, complex class action

13   litigation. *See Aguilar v. Wawona Frozen Foods*, No. 1:15 CV 00093 DAD EPG, 2017 WL

14   2214936, at *6 (E.D. Cal. May 19, 2017) (noting that the plaintiff's attorney arrived at his rate of

15   $826 by reference to a decision rendered by the Santa Clara County Superior Court and observing

16   that other partners with comparable experience were awarded the same amount in this District)

17   (citing *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 452–453 (E.D. Cal. 2013) (reducing

18   rate for a partner with 21 years of experience from $900 to $720 per hour)). The total lodestar

19   amount for the cumulative 1,561.4 hours expended by plaintiffs' attorneys in litigating this action

20   is $1,083,048.60. (Doc. No. 87-3 at 16, ¶ 59.) Given the requested attorneys' fees of

21   $2,333,333.33, the lodestar multiplier is, therefore, approximately 2.15. This is on the lower end

22   of multipliers which are typically approved in class action settlements. *See* 4 NEWBERG ON

23   CLASS ACTIONS § 14.7 (courts typically approve percentage awards based on lodestar cross-

24   checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is comparable to multipliers used by

25   the courts").

26          Accordingly, and in light of the significant relief obtained by counsel on behalf of the

27   class members, the court finds that the requested attorneys' fee award is reasonable.

28   /////

2.     Counsel's Requested Expenses are Reasonable

Expense awards "should be limited to typical out-of-pocket expenses that are charged to a fee paying client and should be reasonable and necessary." *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007). These can include reimbursements for "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees." *Id.*

Class counsel has incurred costs amounting to $49,857.37 as expenses incidental to and necessary for the representation provided in connection with this action. (Doc. No. 87-1 at 33.) According to class counsel, "[t]hese costs were incurred for such things as filing fees, consultant's fees, deposition fees, deposition transcripts, postage, copying, messenger services, preparing for and participating in mediation, mediation fees, travel, court fees, attorney service fees, private investigator to search for Class Members, etc." (*Id.*) (citing Doc. Nos. 87-3 at ¶ 66, Ex. 6; 87-4 at ¶ 5, Ex. 5; 87-5 at ¶ 4, Ex. 3; 87-6 at ¶ 13, Ex. E.) The court finds that these are all reasonable expenses to be awarded in the amount sought.

3.     The Requested Class Representative Incentive Payments are Reasonable

"Incentive awards are fairly typical in class action cases." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). However, the decision to approve such an award is a matter within the court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Generally speaking, incentive awards are meant to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59. The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . . [C]oncerns over potential conflicts may be especially pressing where . . . the proposed service fees greatly exceed the payments to absent class members." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted). A class representative must justify an incentive award

14

through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [her] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). Incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff undertakes a significant "reputational risk" by bringing suit against their former employers. *Rodriguez*, 563 F.3d at 958–59. The district court must evaluate such awards individually, using "'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation.'" *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)). In addition, "[t]o assess whether an incentive payment is excessive, district courts balance 'the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *Hopson v. Hanesbrands Inc.*, No. CV-08-0844 EDL, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) (quoting *Stanton*, 327 F.3d at 977).

Here, class counsel requests that $15,000 be awarded to plaintiff Balfour, or .2 percent of the gross settlement fund, and $20,000 be awarded to plaintiff Syed, or .3 percent of the settlement fund. Class counsel contends the sums are modest and should be awarded to the named representatives "for their commitment to prosecuting this case for nearly five years, their efforts, risks undertaken for payment of attorneys' fees and costs if this action had been lost, general release of all claims arising from their employment, stigma upon future employment opportunities for having sued a former employer, as well as the substantial recoveries to be enjoyed by every member of the Class." (Doc. No. 87-3 at 17, ¶ 67.)[3] Further, class counsel

---

[3] At argument, counsel represented that both named representatives feared being prevented from future work in the industry due to their participation in this action. According to counsel, plaintiff Ashley Balfour was instrumental in speaking with at least 35 to 40 class members during the certification phase and answered questions about the settlement. Both named plaintiffs searched for documents, responded to discovery, participated in depositions, and reviewed the settlement agreement. (*See* Doc. Nos. 76-6; 76-7.) Class counsel also reported that plaintiff Sarmad Syed attended the mediation on September 1, 2016 in Encino, California. (Doc. No. 76-7 at 5, ¶ 15.)

represents that plaintiffs have invested personal time and effort during the investigation phase while prosecuting the action and also in pursuing settlement of the case.  (*Id.*  17–18, ¶ 68.)

While incentive payments of $15,000 and $20,000 respectively are on the higher end of the allowable spectrum, given the average recovery of class members in this case, the incentive payments in the amounts requested are not outside the realm of what has been approved as reasonable by courts.  *See e.g.*, *Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014) (approving $15,000 incentive payments for average recovery of $3,700); *see also, e.g.*, *Ross v. U.S. Bank Nat. Ass'n*, No. C07-02951SI, 2010 WL 3833922, at *2 (N.D. Cal. Sept. 29, 2010) (finding $20,000 for each of the four class representatives an appropriate incentive payment where the total settlement fund amounted to $1,050,000).  Nothing in the declarations of the named plaintiffs offered during the preliminary approval phase nor in the settlement agreement indicates that plaintiffs' agreement to the settlement was conditioned on any promise of them receiving an incentive award.  The court finds these incentive payments are fair and do not destroy the adequacy of class representation in this case.

    4.    Payment to the Settlement Administrator is Reasonable

The settlement provides that $11,500 shall be paid to CPT Consulting.  (Doc. No. 871-34.)  This calculation accounts for "all costs incurred to date, as well as estimated costs involved in completing the settlement, to issue and print checks, tax reporting, answer questions, etc."  (Doc. No. 87-2 at 4, ¶ 20.)   The court finds these costs reasonable and will direct payment in the requested amount.

    5.    PAGA Payment

Under the settlement agreement, $100,000 from the fund shall be designated to resolution of the PAGA claim, and $75,000 or 75 percent of that amount allotted shall be paid to the Labor Workforce and Development Agency and $25,000 will be paid to the class.  (Doc. No. 84 at 21.)  The parties provide that this result was achieved through the good faith negotiations facilitated by the mediator.  In addition, this allocation was approved by the court in its order granting preliminary approval of class settlement.  As indicated by the parties, nothing since has changed since preliminary approval was granted that would render this allocation inappropriate.  The court

1   finds this PAGA payment reasonable, and directs that it be made from the common fund.

2                                   **CONCLUSION**

3          For all of the foregoing reasons, the court finds certification is warranted here and that the

4   settlement is fair, reasonable, and adequate.  Therefore, plaintiffs' motion for final certification of

5   the class and final approval of the class settlement (Doc. No. 87) is granted.  Accordingly,

6      1.  The court certifies the following classes for settlement purposes only:

7              California Class:

8              The "California Rule 23 Class Member(s)" or "California Class"
               means all persons employed by Defendant in California in a
9              Covered Position at any time during the period from October 18,
               2008 through November 30, 2016.  There are an estimated 353
10             members in this group, which includes current and former
               employees who performed work for Defendant solely in California,
11             as well as employees who performed work for Defendant both in
               California as well as outside of California.
12
               "Covered Position" means a drilling fluid specialist, mud engineer,
13             mud man trainee, or consultant mud man, or equivalent title, as
               enumerated in Appendix No. 1 to this Agreement.
14
               FLSA Collective Class Action Class:
15
               "FLSA Collective Action Class" means the 115 individuals
16             employed by Defendant in a Covered Position during the period
               from August 5, 2010 through November 30, 2016, who previously
17             consented to join the Federal Labor Standards Act Collective
               Action, pursuant to Section 16(b), 29 U.S.C. § 216(b), ("FLSA")
18             and who have not performed work for Defendant in California
               during that time period.
19
       2.  The law firms of Spiro Law Corp., Blanchard Law Group, APC, the Holmes Law Group,
20
           APC, and Cohelan Khoury & Singer are appointed as class counsel;
21
       3.  Plaintiffs Sarmad Syed and Ashley Balfour are confirmed as class representatives, with
22
           plaintiff Syed to receive an incentive award of $20,000 and plaintiff Balfour to receive an
23
           incentive award of $15,000 as requested;
24
       4.  Payment to the 467 members of the class shall be made in accordance with the terms of
25
           the settlement;
26
       5.  Payment of $75,000 to the Labor and Workforce Development Agency shall be made in
27
           accordance with the terms of the settlement agreement;
28

                                          17

6. The court awards class counsels' attorneys' fees in the sum of $2,333,333.33, and class counsel shall be reimbursed for litigation costs amounting to $49,857.37;

7. The court awards $11,500 to the appointed settlement administrator CPT Group, Inc.;

8. The parties are directed to abide by the settlement agreement, and the court will retain jurisdiction over this matter for the purpose of enforcing the settlement agreement; and

9. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **July 26, 2017**

_____

UNITED STATES DISTRICT JUDGE

18

**APPENDIX NO. 1**

(Covered Positions/Titles Held by Class Members)

Compliance Specialist

Compliance Specialist Base

Compliance Specialist Base +

COMPLIANCE SPECIALIST G07

Compliance Specialist G07 Base+

Compliance Specialist I

Compliance Specialist I Base +

Compliance Specialist I+

Compliance Specialist II

Compliance Specialist II Base +

Consultant

CONSULTANT DRILLING FLUIDS SPECIALIST

Contingent Worker

DFS III, Flying Squad Lead

DFSIV

Drillin Fluids Engineer Trainee

Drilling Fluids Specialist

Drilling Fluids Specialist

Drilling Fluid Engineer Trainee

Drilling Fluid Specialist

Drilling Fluid Specialist 1

Drilling Fluid Specialist 2

Drilling Fluid Specialist Trainee

| 1 | DRILLING FLUIDS /CONTIGENT |
| 2 | Drilling Fluids Engineer |
| 3 | Drilling Fluids Engineer Base |
| 4 | Drilling Fluids Engineer Trainee |
| 5 | Drilling Fluids Spec I |
| 6 | Drilling Fluids Specialist |
| 7 | Drilling Fluids Specialist SR |
| 8 | Drilling Fluids Specialist |
| 9 | Drilling Fluids Specialist |
| 10 | Drilling Fluids Specialist (1) |
| 11 | Drilling Fluids Specialist 1 |
| 12 | Drilling Fluids Specialist 2 |
| 13 | Drilling Fluids Specialist 3 |
| 14 | Drilling Fluids Specialist Base |
| 15 | |
| 16 | DRILLING FLUIDS SPECIALIST G09 BASE+ |
| 17 | Drilling Fluids Specialist I |
| 18 | Drilling Fluids Specialist II |
| 19 | Drilling Fluids Specialist II + |
| 20 | Drilling Fluids Specialist II+ |
| 21 | Drilling Fluids Specialist III |
| 22 | Drilling Fluids Specialist III + |
| 23 | Drilling Fluids Specialist III+ |
| 24 | Drilling Fluids Specialist IV |
| 25 | Drilling Fluids Specialist IV + |
| 26 | Drilling Fluids Specialist IV+ |
| 27 | Drilling Fluids Specialist Manager |
| 28 | Drilling Fluids Specialist Sr. |

1   Drilling Fluids Specialist Sr. +

2   Drilling Fluids Specialist Sr.

3   Drilling Fluids Specialist Supervisor

4   Drilling Fluids Specialist Trainee

5   Drilling Fluids Specialist, DS - UK

6   Drilling Fluids Specialist, Flying Squad

7   Drilling Fluids Specialist/Contingent

8   Drilling Fluids Supervisor

9   Drilling Fluids Supervisor

10   Drilling Fluids Specialist

11   Drilling Fluids Specialist Sr.

12   Drilling fluids Specialist

13   Especialista De Fluidos Ii

14   Sr. Drilling Fluids Specialist

15   Sr. Drilling Fluids Specialist G11 Base+

16   Sr. Drilling Fluids Specialist Base +

17   Sr. Drilling Fluids Specialist Base

18   Sr. Drilling Fluids Specialist

19

20   SR. DRILLING FLUIDS SPECIALIST +

21   Sr. Drilling Fluids Specialist Base

22   Sr. Drilling Fluids Specialist Base +

23

24   SR. DRILLING FLUIS SPECIALIST

25   Tool Specialist

26   Tool Specialist Sr., WP - UK

27   Tool Specialist, WP - UK

28   Tools Specialist

Tools Specialist 2

WP Fluids Specialist

WP Fluids Specialist 1

WP Fluids Specialist 2

WP Fluids Specialist 3

WP Fluids Supervisor

WP Tool Specialist

WP Tool Specialist 2

WP Tools Specialist

WP Tools Specialist 1

WP Tools Specialist 2

WP Tools Specialist 3

WP Tools Specialist III

WP Tools Supervisor